UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Erika López Prater,

        Plaintiff,

v.

Trustees of the Hamline University of
Minnesota,

        Defendant.

Case No. 23-cv-00505 (KMM-DJF)

**PLAINTIFF'S MEMORANDUM OF
LAW OPPOSING DEFENDANT'S
MOTION TO DISMISS**

## INTRODUCTION

Should the Court deny Plaintiff's Motion to Remand, Plaintiff respectfully requests the Court deny the motion to dismiss brought by Defendant Trustees of the Hamline University of Minnesota.

## FACTUAL BACKGROUND

### I.    HAMLINE HIRES PLAINTIFF TO TEACH AN ART HISTORY COURSE.

Erika López Prater is an academic who holds a Master of Arts and a Doctorate degree in Contemporary Art History from the University of Minnesota. (Compl., Doc. 1-3, ¶ 3.) On June 28, 2022, Hamline hired López Prater as an Undergraduate Adjunct in its College of Liberal Arts for the fall 2022 term. (*Id*. ¶ 4.) López Prater was assigned to teach the fall 2022 class ARTH1100 – World Art, a four-credit course examining the importance of art as a cultural expression across time and from a global perspective. (*Id*.)

## II.   PLAINTIFF PROVIDES STUDENTS ADVANCE NOTICE THAT DEPICTIONS OF HOLY FIGURES WILL BE DISPLAYED IN CLASS.

López Prater was aware that, throughout history, adherents to various religions, or sects within those religions, have taken exception to creating or viewing certain types of religious images, including some Muslims who object to the creation or viewing of art containing images of the Buddha or the Prophet Muhammad. (*Id.* ¶ 5.) Because her class, like many other world art classes, would include discussions of religious traditions and displays of religious art, López Prater stated the following in her course syllabus:

> I aim to affirm students of all religious observances and beliefs in the content of the course. Additionally, this course will introduce students to several religious traditions and the visual cultures they have produced historically. This includes showing and discussing both representational and non-representational depictions of holy figures (for example, the Prophet Muhammad, Jesus Christ, and the Buddha). If you have any questions or concerns about either missing class for a religious observance or the visual content that will be presented, please do not hesitate to contact me.
>
> Students who anticipate religious observance may affect their class attendance or participation must:
>
> • Inform the instructor in writing prior to the anticipated absences(s) preferably at the beginning of the course.
> • Meet with the instructor to arrange a plan to complete the student's academic responsibilities of the course.

(*Id.* ¶ 6.)

Before finalizing the syllabus and publishing it for her students' review, López Prater shared the syllabus with her supervisor Allison Baker, department chair of Defendant's Art and Digital Media Department, and with Hamline. (*Id.* ¶¶ 7-8.) No changes were made, and no concerns were expressed about López Prater's plans to display depictions of the Prophet Muhammad. (*Id.*)

2

López Prater then distributed the syllabus to students on the first day of class, went over it with them, and posted it on the course website. (*Id*. ¶ 9.) Students in López Prater's class knew or should have known that images of the Prophet Muhammad would be shown for educational reasons and knew or should have known that they could avoid viewing those images if they so desired. (*Id*. ¶ 10.) Students also knew or should have known that if their religious observance might affect their participation in class, they were to let López Prater know in advance. (*Id*. ¶ 11.) None did. (*Id*.)

## III. HAMLINE ASKS PLAINTIFF TO TEACH A SPRING SEMESTER CONTEMPORARY ART COURSE.

On September 21, 2022, Baker emailed López Prater and inquired whether she was interested in teaching a contemporary art class in the upcoming spring semester. (*Id*. ¶ 12.) López Prater replied in the affirmative and Baker responded, "my students in your classes have said nothing but wonderful things so we would really love to have you back in the Spring!" (*Id*.) Baker and López Prater discussed the schedule for the spring contemporary art class, and the course was subsequently listed by Hamline in its course offerings for the spring semester. (*Id*. ¶ 13.)

## IV. PLAINTIFF DISPLAYS MUSLIM DEVOTIONAL PAINTINGS OF THE PROPHET MUHAMMAD, ENRAGING A MUSLIM STUDENT.

During an online class on October 6, 2022, as part of a unit on Islamic Art, López Prater displayed the painting *The Prophet Muhammad Receiving Revelation from the Angel Gabriel*. (*Id*. ¶ 14.) The painting dates to the year 1307 and is part of the Ilkhanid manuscript *Jami' al-tawarikh* ("Compendium of Histories"), made by Rashid-al-Din Hamadani in Tabriz, Iran. (*Id*.) This artwork was commissioned by a Sunni Muslim King

3

in Iran. (*Id*.) It is undisputed that the painting was made by a Muslim for Muslims. (*Id*.) The painting is part of a cycle of illustrations narrating and commemorating the Prophet Muhammad's life. (*Id*.) The painting is considered by art historians to be a global artistic masterpiece. (*Id*.) It is undisputed that the painting was made with great reverence for the Prophet Muhammad and Islam and could never be accurately labeled "Islamophobic." (*Id*.)

In the same class, López Prater displayed the painting, *Muhammad, shown with a veiled face and halo, at Mount Hira*. (*Id*. ¶ 15.) This painting is a 16th century depiction of the Siyer-I Nebi, a Turkish epic about the life of the Prophet Muhammad. (*Id*.) The painting shows the Prophet Muhammad with a full-body veil except for his hands. (*Id*.) There is no dispute that this painting was made with great reverence for the Prophet Muhammad and cannot be accurately labeled "Islamophobic." (*Id*.)

López Prater showed her students the paintings for a plainly educational purpose: to discuss the varied historical ways in which the art of Islam has chosen to represent holy personages, and the broader phenomena within Abrahamic traditions of a contested and inconsistent relationship to depicting the divine. (*Id*. ¶ 16.) Professors of art history across the world, including Muslim professors, value and show these paintings and other similar images of the Prophet Muhammad in their classes, including in educational spaces within Muslim-majority countries. (*Id*.) The paintings López Prater showed are considered canonical by professors of Islamic art, on par with canonical works of art from Western artists such as Leonardo da Vinci's *The Last Supper* and Michelangelo's Sistine Chapel ceiling. (*Id*.)

López Prater had displayed both paintings in prior classes at other institutions without incident. (*Id*. ¶ 17.) These paintings and other images of the Prophet Muhammad are displayed in museums across the world and are included in many textbooks about art history or history in general. (*Id*.) They are historically, artistically, religiously, socially, and, in the context of a world art history course, educationally significant. (*Id*.)

Before advancing to the presentation slides containing the images, López Prater notified students that she was about to show representational images of the Prophet Muhammad and explained the paintings' educational and artistic significance. (*Id*. ¶ 18.) Students viewing the online class were provided ample upfront warning about the paintings and were given an ample opportunity to turn away from their computer screens, turn their screens away from them, turn off their screens, or even leave their rooms before the López Prater advanced to the slides containing the images. (*Id*.)

After advancing to the slides containing the images, López Prater provided verbal descriptions of the images and those that followed so students who chose not to look at them would know when she had moved on. (*Id*.) During class, neither López Prater, nor any student in the class, made any inappropriate, rude, or discriminatory statements about the paintings or Islam. (*Id*.)

Despite being warned about the depictions of the Prophet Muhammad in the syllabus and on the day of class, and despite having ample opportunity to not view the paintings, a Muslim student, Aram Wedatalla reportedly viewed the paintings and was reportedly offended by them. (*Id*. ¶¶ 19-20.)

Wedatalla, president of Hamline's Muslim Student Association, stayed on after class and complained that images of the Prophet Muhammad had been displayed. (*Id*. ¶ 20.) López Prater again explained the educational purpose for displaying the images, but Wedatalla was unreceptive to her explanation. (*Id*.) Wedatalla did not suggest that López Prater had surprised students by showing the paintings, but instead was outraged that López Prater had showed the images at all, to anyone. (*Id*. ¶ 21.) By her statements and actions, Wedatalla wanted to impose her specific religious views on López Prater, non-Muslim students, and Muslim students who did not object to images for the Prophet Muhammad— a privilege granted to no other religion or religious belief at Hamline. (*Id*.)

After her conversation with Wedatalla, López Prater emailed Baker to explain what happened in class and to alert Baker that Wedatalla might contact her to discuss further. (*Id*. ¶ 22.) Baker responded via email, "I'm sorry that happened and it sounded like you did everything right. I believe in academic freedom so you have my support but thank you for the heads up." (*Id*.)

## V.   WEDATALLA REFUSES TO BE MOLLIFIED.

On October 7, 2022, Baker notified López Prater that Wedatalla had complained to Marcela Kostihova, Dean of Defendant's College of Liberal Arts. (*Id*. ¶ 23.)  Baker told López Prater that sending Wedatalla an email apologizing for making her feel uncomfortable would be a good idea but instructed López Prater not to backpedal on her right to academic freedom under Hamline's policy. (*Id*.)

López Prater drafted an email to Wedatalla and sent her draft to Baker for review. (*Id*. ¶ 24.) López Prater incorporated Baker's suggestions and sent the email apology to

6

Wedatalla on October 8, 2022. (*Id*.) In the email, López Prater apologized that the images made Wedatalla uncomfortable and told Wedatalla that she had not intended to make anyone upset or to disrespect them. (*Id*.) López Prater pointed out that she had given each student ample time to choose their level of engagement, including the option of turning off the video on their computers or walking away. (*Id*.) López Prater again explained the educational reasons for displaying the images and highlighted that she had shown them for purposes of demonstrating the artistic diversity within Islam itself. (*Id*.) López Prater further wrote:

> I do hope we can both agree that it is important to teach diversity, and by definition, diversity involves bringing contradicting, uncomfortable, and coexisting truths into conversation with each other.

(*Id*.)

Wedatalla did not respond to López Prater's email, but reportedly shared the email with others in furtherance of her campaign to impose her religious beliefs and a discriminatory ban on representations of the Prophet Muhammad at Hamline. (*Id*. ¶ 25.)

## VI.   HAMLINE RENEGES ON ITS OFFER TO RENEW PLAINTIFF'S CONTRACT FOR THE SPRING SEMESTER.

Around October 10, 2022, Kostihova told López Prater that it was not a good idea for her to have shown images of the Prophet Muhammad. (*Id*. ¶ 26.) Kostihova stated that a Muslim person had described López Prater's actions as "shitting on Islam," and said the closest analogy she could come up with was using the "n word" in class. (*Id*.) Kostihova reported that there was a large outcry within the Muslim Student Association as well as Muslim faculty and staff, and that Muslim staff were threatening to resign. (*Id*.) Kostihova

recommended that López Prater apologize in class. (*Id.*) López Prater explained to Kostihova what had happened, why the images were displayed, and the steps she had mindfully taken to accommodate Muslim students who did not wish to see the images. (*Id.*)

In a second conversation the same day, López Prater expressed concern to Kostihova about the issue getting out of hand and the damage it may cause to her career. (*Id.* ¶ 27.)  López Prater explained that excluding these Muslim paintings of the Prophet Muhammad would be discriminatory, in that it would privilege the religious views of Muslims who forbid depictions of the Prophet Muhammad over the historical record and people of other religious views, including Muslims, who do not hold that such images are forbidden. (*Id.*)

On October 11, 2022, in an effort toward reconciliation, López Prater apologized to her class and asked the students if they wanted to discuss the matter further. (*Id.* ¶ 28.)  No student did. (*Id.*) No students reached out to López Prater to discuss the matter further. (*Id.*)

On October 24, 2022, Baker notified López Prater that the class López Prater had been scheduled to teach during the spring semester was cancelled and that López Prater's contract would not be renewed. (*Id.* ¶ 29.) Baker wrote:

> We have deeply appreciated the breadth of knowledge you have brought to Hamline this semester but as a department we need to make a spring semester change and will no longer be able to offer the contemporary art history class online as we had previously discussed.

(*Id.*) The next day, López Prater responded to Baker's email, writing, "I imagine that this need to change plans next semester is related to the events that stemmed from my class a

few weeks ago." (*Id.* ¶ 30.)  Baker never responded or attempted to disabuse López Prater of her conclusion. (*Id.*)

## VII.  HAMLINE ADOPTS AND ENFORCES WEDATALLA'S RELIGIOUS BELIEFS WHILE ASSISTING AND APPROVING IN THE DEFAMATION OF PLAINTIFF.

López Prater was prepared to finish out her World Art course and leave Hamline quietly. (*Id.* ¶ 31.) Hamline administration had other ideas. (*Id.*)

### A.  *Hamline Publicly Defames Plaintiff to the Entire Campus.*

Instead of recognizing that López Prater had displayed the images of the Prophet Muhammad for a proper academic purpose, Hamline decided to impose Wedatalla's interpretation of Islam on all Hamline employees and students. (*Id.* ¶ 32.) Hamline designated its Associate Vice President of Inclusive Excellence, David Everett, as the person to communicate Hamline's imposition of religious beliefs. (*Id.*)

Around November 7, 2022, Everett engaged in libel on Hamline's behalf, publicly defaming López Prater via email to all Hamline employees and students. (*Id.* ¶ 33.) Everett's email, sent in the course of his employment, states in part:

> Several weeks ago, Hamline administration was made aware of an incident that occurred in an online class. <u>Certain actions taken in that class were undeniably inconsiderate, disrespectful and Islamophobic.</u> While the intent behind those actions may not have been to cause harm, it came at the expense of Hamline's Muslim community members. While much work has been done to address the issue in question since it occurred, the act itself was unacceptable.
>
> * * *
>
> I want to make clear: isolated incidents such as we have seen define neither Hamline nor its ethos. They clearly do not meet community standards or expectations for behavior. We will utilize all means at our disposal, up to and including the conduct

process, to ensure the emotional health, security and well-being of all members of our community.

(*Id.*) (Emphasis added.)

When his November 7 email was sent, Everett and Hamline knew and recklessly disregarded the following facts: a) the images López Prater displayed were not created out of any prejudice toward Islam or Muslims; b) López Prater displayed the images for a proper educational purpose and within a proper artistic and historical context; c) López Prater did not display the paintings out of any prejudice toward Islam or Muslims; d) López Prater provided the students ample warning that the paintings would be shown, while explaining the educational purpose for doing so; and e) showing these images plainly fell within López Prater's right to academic freedom, as set forth in Section 3.1.2 of Defendant's Faculty Handbook. (*Id.* ¶ 34.)

The paintings, and López Prater's display of them, are undeniably <u>not</u> "Islamophobic" and Hamline cannot point to any serious academic work suggesting the contrary. (*Id.* ¶ 35.) Multiple Muslim scholars and advocacy organizations agree. (*Id.*)

While Everett's email did not specifically name López Prater, it was obvious from recent events that López Prater was the target of Everett's libelous email. (*Id.* ¶ 37.) Any person with a little time and interest could easily discover that Everett was referring to Plaintiff. (*Id.*) When López Prater saw the email, she, like many others, knew it referred to her, and as a result she suffered immediate, severe, and lasting emotional distress, including various physical manifestations of that distress. (*Id.* ¶ 38.) López Prater also experienced

intense anger that Everett, who never met or talked with her, would speak about her in those terms in an email to every employee at Hamline. (*Id*.)

The defamatory elements of Everett's email have since been published far and wide across the world and tied specifically and personally to López Prater. (*Id*. ¶ 39.)

**B.    *Hamline Makes Plaintiff a Pariah and Quashes Dissent About Its Conduct.***

Around November 11, 2022, Kostihova informed López Prater that Hamline's student newspaper, *The Oracle*, was interviewing people about the events that transpired and intended to publish an article about it. (*Id*. ¶ 40.) Kostihova told López Prater that *The Oracle* intended to omit her name but given that López Prater was the only art historian on campus teaching the only art history class that semester, it would be clear to anyone who read the article that she was the professor at the center of the story. (*Id*.)

The next day, López Prater learned that Hamline had instructed its faculty members not to discuss the matter or involve themselves in it. López Prater subsequently noticed that the faculty members in her department stopped reaching out to her and seemed to be avoiding her. (*Id*. ¶ 41.)

On November 18, 2022, *The Oracle* published a staff editorial, including on its public website, entitled "Incidents of hate and discrimination." (*Id*. ¶ 42.) The student writers parroted the defamatory assertion in Everett's November 7 email that López Prater's conduct was "Islamophobic," and equated López Prater's conduct with a recent "act of homophobia." (*Id*.) Further parroting Hamline, the editorial declared that López Prater had "harmed and traumatized" individuals in the Islamic community. (*Id*.)

Later that day, López Prater emailed Kostihova and Baker calling out Everett's email as defamatory and recounting why the paintings were shown and her efforts to be respectful to any Muslim students who may not want to see them. (*Id.* ¶ 43.) In her email, López Prater decried the lack of any due process and noted that news of the events in her class were being disseminated in a way that denied her any recourse to defend herself. (*Id.*) In her email, López Prater also requested that *The Oracle* not run its intended article, noting:

> This situation has gotten out of control. False, defamatory statements and innuendo have been directed against me and they must stop. I have been given no opportunity to refute these public allegations of Islamophobia. Additionally, a future class has been stripped from me, faculty have been advised not to speak with me about the incident, and the general attitude toward me on campus has become toxic.
>
> * * *
>
> Although I feel that I have been dealt with and impugned unjustly, my intention has always been and remains to be ameliorative and conciliatory. I want to be constructive rather than inflammatory. However, I simultaneously recognize vividly that these ongoing events could dramatically impact my career . . . .

(*Id.* ¶ 44.) López Prater pleas fell on deaf ears. (*Id.*)

On December 6, 2022, *The Oracle* published an article, including on its public website, about the events in López Prater's October 6th class, entitled "Who Belongs?" (*Id.* ¶ 45.) The article quoted and rebroadcast Everett's defamatory statement that López Prater's conduct was "undeniably inconsiderate, disrespectful and Islamophobic." (*Id.* ¶ 46.) The article also reported the defamatory statement of Patti Kersten, Defendant's Dean of Students, that asserted that Plaintiff's conduct was "an act of intolerance." (*Id.*

¶ 47.) In addition, Everett told *The Oracle*, "In lieu [sic] of this incident, it was decided it was best that this faculty member was no longer part of the Hamline community." (*Id.* ¶ 49.) At no point did Everett or Kersten talk to López Prater about the class, the paintings, or the events giving rise to Wedatalla's complaint. (*Id.* ¶ 50.)

Although the article did not specifically name López Prater, there was no mystery as to her identity. (*Id.* ¶ 51.) Since she was the only art historian at Hamline teaching the only art history class offered by Hamline, López Prater was easily identifiable by people both affiliated and unaffiliated with Hamline. (*Id.*) For example, in a January 5, 2023, column in *The American Spectator* magazine identified López Prater as the professor at issue simply by reviewing Hamline's publicly available undergraduate course listings for fall 2022. (*Id.*)

When *The Oracle's* December 6 article was published, López Prater was still teaching her class and finishing out the semester. (*Id.* ¶ 52.) The public disclosure that López Prater was being cast out from the "Hamline community" because she showed historical paintings of the Prophet Muhammad during her October 6th unit on Islamic art contributed significantly to López Prater's feelings of isolation, embarrassment, lack of support, humiliation, and extreme emotional distress. (*Id.*)

The same day it ran the "Who Belongs?" article, *The Oracle* also published a letter to the editor from Hamline Professor and Chair of the Department of Religion, Mark Berkson, Ph. D., entitled "Letter to the Editor on Islamophobia Accusations." (*Id.* ¶ 53.) Berkson's letter defended López Prater, providing a reasoned counterpoint to the discriminatory and defamatory invective perpetrated by Hamline. (*Id.*) Berkson's letter—

unlike any of Hamline's communications to date—accurately described events in López Prater's October 6th class, explained the pedagogical value of the paintings, refuted the administration's defamatory assertions that López Prater's conduct was categorically "Islamophobic" and "an act of intolerance," and set out the disturbing implications of banning such images from the classroom. (*Id*.)

Shortly after the letter was published, Hamline contacted Berkson and told him he should not have submitted his letter. (*Id*. ¶ 54.) *The Oracle* then removed the letter from its website. (*Id*.)

**C.   *The December 8, 2022 "Community Conversation" About Islamophobia.***

On December 8, 2022, Everett hosted an in-person "Community Conversation" on Hamline's campus in which several defamatory statements were made against López Prater by Jaylani Hussein ("Hussein"), Executive Director of the Minnesota chapter of the Council on American-Islamic relations ("CAIR-MN"). (*Id*. ¶ 55.) Hussein falsely asserted that López Prater had shown the images of the Prophet Muhammad for no reason other than to provoke, offend, and hurt Muslim students, and that doing so was "Islamophobic." (*Id*. ¶ 56.) Hussein also falsely stated that López Prater showed the paintings because she does not value Muslims the same as other minorities. (*Id*.) Hussein also made statements to the effect that non-Muslims do not have the right or knowledge to talk about the range of Islamic beliefs, regardless of their education or expertise. (*Id*.)

Berkson, who attended the "Community Conversation," respectfully attempted to question Hussein's false and discriminatory premises. (*Id*. ¶ 57.) Baker and Everett placed their hands on his shoulders and told him to stop. (*Id*.) Berkson nevertheless spoke up:

"When you say 'trust Muslims on Islamophobia,' what does one do when the Islamic community itself is divided on an issue? Because there are many Muslim scholars and experts and art historians who do not believe that this was Islamophobic." (*Id*.) Hussein angrily responded to Berkson, loudly speaking over him in open contempt. (*Id*. ¶ 58.) Hussein also alluded to the possibility of a violent Islamic response, pointing to the 2015 murders at the offices of the *Charlie Hebdo* newspaper in France, where several people were killed in response to the publication of satirical cartoons depicting the Prophet Muhammad. (*Id*.) Hussein referred to the images López Prater showed in class, which, again, were reverentially made by Muslims for Muslims, as "racist" and "disgusting," and called for them to be banned from campus. (*Id*.)

At no point during the "Community Conversation" did Everett or any other Hamline administrator interrupt Hussein, address his allusion to violence, or allow Berkson to finish his questions. (*Id*. ¶ 59.) Instead, Everett and Hamline demonstrated their support and agreement with Hussein's defamatory statements regarding López Prater and adopted them as their own. (*Id*.) In fact, Everett subsequently published a video of the "Community Conversation" to every employee of Hamline, and possibly, others, from his Hamline email address. (*Id*. ¶ 60.) The video Everett published includes Hussein's defamatory statements regarding Plaintiff. (*Id*.)

## VIII. HAMLINE'S ENFORCEMENT OF WEDATALLA'S RELIGIOUS BAN ON HISTORICAL PAINTINGS OF THE PROPHET MUHAMMAD CONTRADICTS HAMLINE'S POLICY ON ACADEMIC FREEDOM.

On December 9, 2022, the day after the "Community Conversation," Everett and Hamline President Fayneese Miller, emailed Hamline staff and falsely implied that López

Prater had somehow showed the images of the Prophet Muhammad disrespectfully. (*Id.* ¶ 61.) Everett and Miller's email asserted that they "do not suggest that some material be stricken from our classrooms and not shared with students." (*Id.* ¶ 62.) But two paragraphs later, Everett and Miller stated that the historical paintings containing images of the Prophet Muhammad should have been stricken from López Prater's classroom and not shared with students. (*Id.*) They elaborated:

> It is not our intent to place blame; rather, it is our intent to note that in the classroom incident—where an image forbidden for Muslims to look upon was projected on a screen and left for many minutes—respect for the observant Muslim students in that classroom should have superseded academic freedom.

(*Id.*)

Everett and Miller's statement that "respect for the observant Muslim students in that classroom should have superseded academic freedom" not only shows the expressly discriminatory nature of their ban on images of the Prophet Muhammad, but also runs directly counter to Hamline's obligation to afford academic freedom to its faculty. (*Id.* ¶ 63.) Section 1.1 of Hamline's Faculty Handbook states that the policies contained in the Faculty Handbook apply to "all faculty members of Hamline University" and section 4 states that adjunct professors, like López Prater, are included in the definition of faculty as "persons having appointment for the instruction of students . . . ." (*Id.* ¶ 64) Section 3.1 of the Faculty Handbook pertains to the academic freedom of all Hamline faculty. (*Id.* ¶ 65.) It states in relevant part:

> 3.1.2   All faculty members are entitled to freedom in the classroom in discussing their subject, but they should be careful not to introduce

into their teaching controversial matter which has no relation to their subject.

(*Id.*)

Hamline's actions and statements violated the Handbook's provisions related to academic freedom because (1) the paintings López Prater displayed during the October 6 class were plainly relevant to the subject of world art, and (2) banning images of the Prophet Muhammad based on the Muslim majority view is discriminatory because doing so would privilege those forms of Islam who believe the images should not be shown to the detriment of other sects of Islam, and other religions, that do not ban such images. (*Id.* ¶¶ 66-68.)

## IX. HAMLINE HIRES A REPLACEMENT TO TEACH A COURSE THAT PLAINTIFF WAS QUALIFIED TO TEACH.

After deciding to not renew López Prater, Hamline hired a different adjunct instructor to teach a spring semester course entitled "Visual Constructions of Gender." (*Id.* ¶ 69.) López Prater was qualified to teach the course and had previously taught similar courses on art and gender at other institutions but was not asked to teach the spring course at Hamline. (*Id.* ¶ 70.)

## STANDARD

To withstand a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual allegations to state a claim to relief that is plausible on its face." *Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014) (quotation omitted). The complaint need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544, 556 (2007). A claim is sufficiently plausible when it sets forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 660 (8th Cir. 2012) (quotation omitted). When considering a motion to dismiss, courts must take all factual allegations in the complaint as true and construe all reasonable inferences in favor of the plaintiff. *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013). Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving party. *See Hughes v. Rowe*, 449 U.S. 5, 10 (1980).[1]

## ARGUMENT

## I.   LÓPEZ PRATER'S COMPLAINT STATES A CLAIM OF RELIGIOUS DISCRIMINATION UNDER THE MINNESOTA HUMAN RIGHTS ACT.

The Minnesota Human Rights Act (MHRA) provides that it is an unfair employment practice for an employer, because of religion, to refuse to hire a person, Minn. Stat. § 363A.08, subd. 2(1), or to discriminate against a person with respect to hiring, tenure,

---

[1] In the "procedural posture" section of its memorandum supporting its motion to dismiss, Hamline asserts that López Prater's state law claims all require the interpretation of a CBA governing López Prater's employment and that they are therefore preempted by the LMRA. In the legal argument section of its memorandum, however, Hamline presented no argument or authority to support the assertion. Nor was there any argument or authority provided in the "procedural posture" section of Hamline's memorandum. It therefore appears that Hamline is not raising LMRA preemption as a basis for dismissal in connection with the instant motion. To the extent Hamline meant to argue LMRA preemption as a basis for dismissal in its motion to dismiss, that argument is waived. *See United States v. Stuckey*, 255 F.3d 528, 531 (8th Cir. 2001) (refusing to consider cursory argument unsupported by citation to legal authority and noting that judges "are not like pigs, hunting for truffles buried in briefs"). Regardless, that argument must be rejected for the reasons set forth in Plaintiff's Memorandum of Law Supporting Plaintiff's Motion to Remand, which arguments are incorporated herein.

compensation, terms, upgrading, conditions, facilities, or privileges of employment. *Id.*
§ 363A.08, subd. 2(3). The MHRA does not define "religion," but the parallel federal
antidiscrimination law, Title VII of the Civil Right Act of 1964, states that "[t]he term
'religion' includes all aspects of religious observance and practice, as well as belief . . . ."
42 U.S.C. ¶ 2000e(j).[2]

López Prater's allegations are sufficient to provide Hamline "fair notice of what the
. . . claim is and the grounds upon which it rests," *Bell Atlantic Corp. v. Twombly*, 550 U.S.
544, 556 (2007), which is all that is required to state a claim. She alleges that she was
meeting Hamline's legitimate expectations (Compl., Doc. 1-3, at ¶¶ 3-13, 76) but Hamline
subjected her to several adverse employment actions anyway, including failing to renew
her contract for the spring 2023 semester, publicly denouncing López Prater as
"Islamophobic," calling her conduct "an act of intolerance," announcing her non-renewal
before the end of fall semester classes, and aiding further public defamation and
humiliation of López Prater. (*Id.* ¶¶ 26-70, 78.) López Prater further alleges that Hamline
subjected her to these adverse actions because "she is not Muslim, because she did not
conform her conduct to the specific beliefs of a Muslim sect, and because she did not
conform her conduct to the religion-based preferences of Hamline that images of the
Prophet Muhammad not be shown to any Hamline student." (*Id.* ¶ 79. *See also id.* ¶¶ 14-
27, 33-34, 40-42, 45-50, 55-68.) In other words, López Prater was subjected to the adverse

---

[2] Minnesota courts often apply principles developed in Title VII adjudication
because of substantial similarities between Title VII and the MHRA. *Goins. v. W. Group*,
635 N.W.2d 717, 724 n.3 (Minn. 2001).

employment actions "because of . . . religion," in violation of the plain language of the MHRA. *See* Minn. Stat. ¶ 363A.08, subd. 2. Hamline's motion to dismiss the MHRA religious discrimination claim should be denied.

Citing three inapposite cases decided on summary judgment (as compared to a motion to dismiss),[3] Hamline argues that López Prater has not shown a "causal connection" between religion and the adverse employment actions. Hamline's argument must be rejected.

### A.    *López-Prater Was Discriminated Against Because She is Not Muslim.*

López Prater asserts two styles of religious discrimination claims. The first is more common: discrimination because she is not a member of a particular religion, in this case, Islam. A generalized prima facie case of this type of discrimination typically consists of the following elements: 1) the plaintiff was a member of a protected class; 2) the plaintiff was qualified for the job; 3) the plaintiff suffered an adverse employment action; and 4)

---

[3] *Eilefson v. Park Nicollet Health Services*, A22-0189, 2022 WL 3149256, at *1 (Minn. Ct. App. Aug. 8, 2022), review denied (Dec. 13, 2022) (plaintiff's religious discrimination claim dismissed on summary judgment because there was no evidence the plaintiff was replaced by a person outside the protected class, or any other facts giving rise to an inference of discrimination); *Zaitz v. Minneapolis Downtown Council*, No. A10-1897, 2011 WL 2623416 (Minn. Ct. App. 2011) (plaintiff's religious discrimination claim dismissed on summary judgment because evidence showed the employer was upset with plaintiff imposing her religious beliefs on others, not because of her specific religious beliefs); *Ennis v. Sonitrol Mgmt. Corp.*, 02-CV-9070 (TPG), 2006 WL 177173 (S.D.N.Y. Jan. 25, 2006) (plaintiff's religious discrimination claim dismissed on summary judgment because his statistical evidence did not support an inference of discrimination and indicated that there was no discrimination, and because the supervisor who engaged in intensely religious conduct at work was uninvolved in the decision to terminate the plaintiff's employment).

circumstances giving rise to an inference of discrimination. *See Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 887 (8th Cir. 2015).

López Prater alleges she was not Muslim, was qualified for the job, and suffered numerous adverse employment actions that would not have occurred if she were Muslim. For example, López Prater would not have been non-renewed for displaying images of the Prophet Muhammad if López Prater were Muslim. López Prater's conduct would not have been called "Islamophobic" were she Muslim herself. Were López Prater Muslim, Hamline would not have stood idly by and allow Hussein to assert that López Prater had shown the images of the Prophet Muhammad for no reason other than to provoke, offend, and hurt Muslim students, that doing so was "Islamophobic," and that López Prater showed the paintings because she does not value Muslims the same as other minorities. This is sufficient to state a prima facie case of religious discrimination.

Hamline objects that López Prater's Complaint does not contain a specific allegation that she belongs to a protected class other than "not Muslim." Hamline's objection must be rejected because discrimination against a person for not belonging to a particular religion falls within the plain language of the MHRA's proscription against employment discrimination "because of . . . religion." *See* Minn. Stat. ¶ 363A.08, subd. 2. *See also Campos v. City of Blue Springs, Missouri*, 289 F.3d 546, 550–51 (8th Cir. 2002) (upholding jury verdict finding that employee was constructively discharged in violation of Title VII because she was not a Christian).

Hamline's alternative argument—that López Prater does not specifically allege Hamline knew López Prater was not Muslim—must be rejected for at least two reasons.

First, López Prater is not required to allege every element of a prima facie case to state a valid claim of religious discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002); *see also Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1014 (8th Cir. 2013) ("Under *Swierkiewicz*, a plaintiff need not plead facts establishing a prima facie case of discrimination ... in order to defeat a motion to dismiss."); *Ring v. First Interstate Mortg., Inc.*, 984 F.2d 924, 926 (8th Cir. 1993) (stating that a prima facie case is an evidentiary standard, which is not the proper measure of whether a complaint fails to state claim).

Second, López Prater's Complaint is replete with facts from which it can be easily inferred that Hamline knew, or at least assumed, that she was not Muslim. *Cf. Darby v. Temple Univ.*, 216 F. Supp. 3d 535, 542 (E.D. Pa. 2016) (plaintiff's complaint did not allege the employer knew of his specific religion, but motion to dismiss denied because the allegations raised a reasonable expectation that discovery would reveal evidence of the employer's knowledge). For example, Kostihova spoke to López Prater as one does to an uninformed non-Muslim, telling her that one Muslim person had described López Prater's actions as "shitting on Islam," and that there had been a large outcry amongst Muslim students, faculty, and staff. Everett falsely asserted that López Prater's conduct was "undeniably . . . Islamophobic." Kersten characterized López Prater's conduct as "an act of intolerance." Hussein falsely asserted that López Prater had shown the images of the Prophet Muhammad for no reason other than to provoke, offend, and hurt Muslim students, and that doing so was "Islamophobic." Hussein also falsely stated that López Prater showed the paintings because she does not value Muslims the same as other minorities. Hussein also made statements to the effect that non-Muslims do not have the right or knowledge to

22

talk about the range of Islamic beliefs, regardless of their education or expertise. It is reasonable to infer from the content and character of these communications that the individuals making them knew, or at least assumed, that López Prater was not Muslim. On a motion to dismiss, López Prater must be given the benefit of this inference. *Martin v. Iowa*, 752 F.3d 725, 727 (8th Cir. 2014). Hamline's motion must be denied.

**B.    *López-Prater Was Discriminated Against for Failing to Conform to the Religious Tenant that Images of the Prophet Muhammad Must Not Be Shown.***

López Prater's second type of MHRA claim is less common: that she was discriminated against because she failed to conform to another's religious beliefs. Courts have made the common-sense observation that such conduct by employers constitutes discrimination "because of religion." *See Campos v. City of Blue Springs, Missouri*, 289 F.3d 546, 550–51 (8th Cir. 2002) (upholding jury verdict finding that employee was constructively discharged because she was not a Christian); *Venters v. City of Delphi*, 123 F.3d 956 (7th Cir. 1997) (recognizing Title VII religious discrimination claim that employee was discharged because she did not measure up to her supervisor's religious expectations); *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993) ("Title VII has been interpreted to protect against requirements of religious conformity and as such protects those who refuse to hold, as well as those who hold, specific religious beliefs.").

In such cases, a plaintiff must show (1) that she was subjected to some adverse employment action; (2) that, at the time the employment action was taken, the employee's job performance was satisfactory; and (3) some additional evidence to support the

inference that the employment actions were taken because of a discriminatory motive based upon the employee's failure to hold or follow his or her employer's religious beliefs. *Shapolia*, 992 F.2d at 1038.[4] López Prater alleges facts supporting that she was subjected to several adverse employment actions, that her job performance was satisfactory, and that she was subjected to the adverse employment actions because she failed to comply with the religious-based tenant that she not display, under any circumstance, images of the Prophet Muhammad, even if her purpose was proper. This is sufficient to state a claim.

Preposterously, Hamline argues that López Prater's allegations "do not show that Hamline University was imposing any religious belief upon Plaintiff." The Complaint contains numerous facts supporting that Hamline made conformity with Wedatalla's religious tenant against images of the Prophet Muhammad a term and condition of López Prater's employment, and then subjected her to numerous adverse employment actions when López Prater failed to conform.

---

[4] The religious tenant need not be held by the decisionmakers who subjected López Prater to the adverse employment actions, because, based on the allegations in the Complaint, those individuals adopted and enforced what essentially amounts to the religious-based "customer preference" of Wedatalla and some other Muslims. "An employer's action based on the discriminatory preferences of others, including coworkers or customers, is unlawful." EEOC, Compliance Manual, Section 12: Religious Discrimination, 12-II(B), Customer Preference, available at https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination (last visited Mar. 29, 2023). *See also* EEOC, Religious Garb and Grooming the Workplace: Rights and Responsibilities, Question 5, available at https://www.eeoc.gov/laws/guidance/religious-garb-and-grooming-workplace-rights-and-responsibilities (last visited Mar. 29, 2023); EEOC Compliance Manual on Religious Discrimination (2008) at Example 14; *Schneider v. Jax Shack, Inc.*, CV84-L-303, 1986 WL 696373, at *2 (D. Neb. Oct. 1, 1986) ("It would be anomalous to allow customers' preferences and prejudices to decide whether discrimination is valid, when it was to no small degree the aim of the 1964 Civil Rights Act to blight those very preferences and prejudices.").

Hamline's argument that López Prater has not alleged her own sincerely held religious belief is similarly frivolous. What matters in this context is not so much what López Prater's religious beliefs are, but Hamline's perception of López Prater's non-conformity to the religious tenants of Wedatalla and other Muslims. *Venters*, 123 F.3d at 972.

López Prater has stated a valid claim for religious discrimination under the MHRA. The Court should deny Hamline's motion.

## II.  LÓPEZ PRATER STATES A CLAIM FOR REPRISAL IN VIOLATION OF THE MHRA.

The MHRA provides that it is an unfair discriminatory practice for employers to engage in reprisal against any person who engages in protected conduct under the MHRA. Minn. Stat. § 363A.15. Protected conduct includes, in relevant part, conduct in opposition to a practice forbidden by the MHRA. *Id.* To prove a reprisal claim, a plaintiff must show that: (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) there exists a causal connection between the two. *McLain v. Andersen Corp.*, 567 F.3d 956, 969 (8th Cir. 2009).

López Prater alleges that in response to Kostihova's heavy criticism for showing historical images of the Prophet Muhammad, López Prater defended her actions in an effort to retain her employment, pointing out that excluding these Muslim paintings of the Prophet Muhammad would be discriminatory, in that it would privilege the religious views of Muslims who forbid depictions of the Prophet Muhammad over the historical record and people of other religious views, including Muslims, who do not hold that such images are

forbidden. (Compl., Doc. 1-3, at ¶ 27.) López Prater's report to Kostihova that requiring conformity with Wedatalla's religious tenant as discriminatory is conduct in opposition to a practice forbidden by the MHRA. This is protected conduct. After two weeks of silence from Kostihova on the matter, López Prater was told she would no longer be teaching the spring course and her contract would not be renewed. Shortly thereafter, Hamline administration mounted a campaign of defamation, ostracism, and humiliation against López Prater. These are sufficient facts to state a claim for reprisal.

In its motion, Hamline argues that López Prater was not objecting to any discrimination by Hamline, but rather "justifying her own actions." This mere characterization is not consistent with the allegations in the Complaint. Per the Complaint, López Prater offered reasons for why she had shown the paintings, but she went a step further, telling Kostihova that enforcing Wedatalla's religious prohibition on images of the Prophet Muhammad would be discriminatory. López Prater has thus stated a valid claim of MHRA reprisal and Hamline's motion must be denied.

## III.   LÓPEZ PRATER WAS DEFAMED BY HAMLINE.

"To establish a defamation claim [under Minnesota law], a plaintiff must prove three elements: (1) the defamatory statement is communicated to someone other than the plaintiff; (2) the statement is false; and (3) the statement tends to harm the plaintiff's reputation and to lower the plaintiff in the estimation of the community." *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919–20 (Minn. 2009) (quotation omitted). López Prater alleges that the following statements are false, communicated to someone other than her, and tend to harm her reputation and lower her in the estimation of the community:

    a.      Everett's statement in his November 7, 2022 email that López Prater had engaged in conduct that was [undeniably] inconsiderate, disrespectful, and Islamophobic";

    b.      Kersten's statement to *The Oracle* student newspaper that López Prater's conduct was "an act of intolerance"; and

    c.      Hussein's statements at the December 8, 2022 "Community Conversation" that:

        i.      López Prater showed the images of the Prophet Muhammad for no reason other than to provoke, offend, and hurt Muslim students;

        ii.      That López Prater's conduct was "Islamophobic," and

        iii.     That López Prater showed the paintings because she does not value Muslims the same as other minorities.[5]

(Compl., Doc. 1-3, at ¶ 89.)

Hussein's statements were republished by Everett, who knew or should have known that the statements were false and defamatory. (Compl., Doc. 1-3, at ¶ 34.) Republication of Hussein's statements thus falls under the common law republication rule, acknowledged by the Minnesota Supreme Court in *Church of Scientology of Minnesota v. Minnesota State Med. Ass'n Found.*, 264 N.W.2d 152, 156 (Minn. 1978) ("Those who merely deliver or transmit defamatory material previously published by another will be considered to have published the material only if they knew, or had reason to know, that the material was false and defamatory.").

These defamatory statements are among the worst accusations one can publicly level against a recently graduated Ph.D. hoping for a tenure-track career at a university.

_____

[5] Upon further review, López Prater no longer contends that Hussein's statement listed at paragraph 89(c)(iv) of her Complaint constitutes actionable defamation.

Nevertheless, Hamline published them to the entire Hamline campus, then the statements were republished all over the world.

In its motion, Hamline does not challenge that these communications were false, defamatory, and published by Hamline to individuals other than López Prater. Nor does Hamline challenge the application of the common law republication rule as it relates to Everett's republication of Hussein's defamatory statements. Hamline instead argues that the defamatory statements are constitutionally protected and otherwise privileged. Hamline's arguments are unavailing.

**A.      *The Defamatory Statements are Not Constitutionally Protected Opinion.***

The First Amendment protects statements of "pure opinion" from defamation liability. *Diesen v. Hessburg*, 455 N.W.2d 446, 450 (Minn. 1990) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974)). According to Minnesota courts, "pure opinions" are those that are incapable of being proven true or false, or that cannot be reasonably be interpreted as stating actual facts. *Lund v. Chicago & Nw. Transp. Co.*, 467 N.W.2d 366, 368–69 (Minn. Ct. App. 1991) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17 (1990)). Thus, if the speaker is expressing a subjective view, such as an interpretation, theory, conjecture, or surmise, rather than objectively verifiable facts, the statement is not actionable. *Schlieman v. Gannett Minn. Broad.*, 637 N.W.2d 297, 308 (Minn. Ct. App. 2001). In assessing whether a statement is an opinion, Courts may consider its specificity and verifiability, as well as its literary and public context. *Larson v. Gannett Co., Inc.*, 940 N.W.2d 120, 147 (Minn. 2020).

Hamline argues that the alleged defamatory statements are of the "pure opinion" variety. But a statement of opinion may be actionable in defamation if the statement, in view of its context or surrounding language, implies the assertion of objective fact. *Milkovich*, 497 U.S. at 18. *See also Alexander v. Strong*, A20-1614, 2021 WL 2645516, at *3, n.3 (Minn. Ct. App. June 28, 2021). This holds true even if the statement includes qualifying language couching it as an opinion. In *Milkovich v. Lorain Journal Co.*, the United States Supreme Court explained: "If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead[s] to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." *Milkovich*, 497 U.S. at 18–19.

Hamline cites numerous cases in which the defendants offered vague opinions disconnected from facts or opine upon the general character of a person's actions, *e.g.*, "I think that was racist," or "inappropriate," or "unacceptable." But Hamline and Hussein did not simply assert that López Prater is an Islamophobe or generally opine that showing images of the Prophet Muhammad is Islamophobic. They made false assertions of fact: that López Prater <u>was motivated</u> to display the images of the Prophet Muhammad by her fear, hatred, or aversion of Muslims (Islamophobia); because of "intolerance" toward Muslims; to provoke, offend, and hurt Muslim students; and because she does not value Muslims the same as other minorities. Motive is a provable or disprovable fact. Indeed, Hamline hopes to disprove that it was motivated to defame, ostracize, and humiliate López Prater and end the employment relationship because of religion and/or López Prater's protected conduct.

*Cf. La Liberte v. Reid*, 966 F.3d 79, 93 (2d Cir. 2020) (contrasting "accusation[s] of concrete, wrongful conduct," which are actionable, against "general statements charging a person with being racist, unfair, or unjust," which are not).

Courts are in accord that publishing a statement that falsely imputes an illegal or improper motive for a person's actions steps beyond the realm of protected pure opinion and into the realm of an assertion that can be proven true or false. For example, the Minnesota Court of Appeals held that the statement that a plaintiff was a "Communist lackey controlled by the Vietnamese Communists" went beyond loose, figurative language, and were instead specific statements sufficiently factual to be proven true or false. *Tuan J. Pham v. Thang Dinh Le*, A06-1127, 2007 WL 2363853, at *5 (Minn. Ct. App. Aug. 21, 2007). In *Overhill Farms, Inc., v. Lopez*, a California appeals court held that, in context, statements that the plaintiff was racist were not mere opinions because they implied the plaintiff engaged in a mass employment termination based upon racist motivations, which motivations are a provable or disprovable fact. *Overhill Farms, Inc. v. Lopez*, 190 Cal. App. 4th 1248, 1252, 119 Cal. Rptr. 3d 127, 132 (2010). *See also Payne v. WS Servs.*, LLC, No. CIV-15-1061, 2016 WL 3926486, at *2–3 (W.D. Okla. July 18, 2016) (statements that an employer "does not hire women" and is run by "male womanizing people" are actionable because they imply the employer engages in discriminatory, gender-based hiring practices, which is verifiable); *Fitzgerald v. City of Fresno*, No. 121CV01409AWISAB, 2022 WL 1204707, at *10 (E.D. Cal. Apr. 22, 2022) (mayor's tweet that police officer was fired because of displays of racism was actionable because

whether the police offer was fired for violating policies against racism is an ascertainable fact).

Applying the factors identified in *Larson*, 940 N.W.2d at 147, the statements López Prater identifies as defamatory were specific to her and to her display of highly regarded, centuries-old Muslim paintings of the Prophet Muhammad in an Islamic Art unit of a World Art History course. They impute improper motives to López Prater, which motives are verifiable facts. The literary and public context of the statements points squarely at López Prater and her motives. They are not mere opinion; they are actionable defamatory statements.

Because Hamline published and republished defamatory statements that falsely impute improper motives to López Prater for her display of highly regarded, centuries-old Muslim paintings of the Prophet Muhammad in an Islamic Art unit of a World Art History course, Hamline's contention that the statements are pure opinion is simply wrong.

## B.   *Plaintiff is not a Limited Purpose Public Figure.*

López Prater was not a limited purpose public figure at the time of the defamatory statements. To determine whether a plaintiff is a limited purpose public figure, a court must 1) identify the particular public controversy giving rise to the defamatory speech, and 2) examine the nature and extent of the plaintiff's involvement in the controversy. *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1119–20 (8th Cir. 1999). "A public controversy is a dispute that 'has received public attention because its ramifications will be felt by persons who are not direct participants.'" *Chafoulias*, 668 N.W.2d at 651, (*quoting Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1296 (D.C. Cir. 1980)). "In isolating

the public controversy, courts look to those controversies that are already the subject of debate in the public arena at the time of the alleged defamation." *Id* at 652.

Hamline argues that the public controversy is "whether depictions of the Prophet Muhammad may be displayed." But that is not the specific controversy about which the defamatory statements were made. The specific controversy was the propriety and motivation of an art history professor displaying highly regarded, centuries-old paintings of the Prophet Muhammad, made by Muslims for Muslims, in an Islamic Art unit of an undergraduate World Art History course at a secular university. There is no doubt Hamline subsequently generated this public controversy through its defamatory conduct, but no such public controversy existed at the time of the alleged defamatory statements. *See McGuire v. Bowlin*, 932 N.W.2d 819, 829 (Minn. 2019) ("… a party cannot stir up controversy by making defamatory statements and then point to the resulting controversy as a basis for assigning the defamed party public-figure status."). Certainly, no such controversy is evident from the face of López Prater's Complaint.

Nor can it be said that López Prater thrust herself to the forefront of that controversy to influence its resolution. *See Gertz*, 418 U.S. at 345. She simply displayed the paintings in an undergraduate World Art History class, just as she had done without controversy at other universities. She had no reason to believe it would explode into the controversy it became. There are no allegations in the Complaint to support that Plaintiff voluntarily participated in the public airing of the controversy before the defamatory statements, that she played a prominent role in the debate of the controversy at the time of the defamatory

32

statements, or that she had access to effective channels of communication to counteract the defamatory statements at the time they were made.[6]

Furthermore, even public figures may prove defamation through clear and convincing evidence that the defendant acted with actual malice when making the defamatory statement. *Britton v. Koep*, 470 N.W.2d 518, 520 (Minn. 1991). The actual malice standard requires a plaintiff to prove by clear and convincing evidence that a challenged statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). To show "reckless disregard," a plaintiff must prove the defendant made the statement "while subjectively believing that the statement [was] probably false." *Chafoulias v. Peterson*, 668 N.W.2d 642, 655 (Minn. 2003). The evidence must be sufficient "to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [the] publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Actual malice can be established through the defendant's own actions or statements, the dubious nature of its sources, and the inherent improbability of the story, among other circumstantial evidence. *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 183 (2d Cir. 2000).

---

[6] In fact, the allegations in the Complaint support that, at the time of the defamatory statements, López Prater was firmly <u>against</u> the public airing of this controversy, she had been given no opportunity to refute the public allegations of Islamophobia, and news of events in her class were being disseminated in a way that denied her any recourse to defend herself. (Compl., Doc. 1-3, at ¶¶ 31, 43-44.)

López Prater's Complaint sets forth facts that plausibly support a finding of actual malice. At paragraph 34 of her Complaint, López Prater specifically alleges facts supporting actual malice with respect to Everett's "undeniably Islamophobic" accusation:

> At the time his November 7 email was sent, Everett and Hamline knew and recklessly disregarded the following facts: a) the images López Prater displayed were not created out of any prejudice toward Islam or Muslims; b) López Prater displayed the images for a proper educational purpose and within a proper artistic and historical context; c) López Prater did not display the paintings out of any prejudice toward Islam or Muslims; d) López Prater provided the students ample warning that the paintings would be shown, while explaining the educational purpose for doing so; and e) showing these images plainly fell within López Prater's right to academic freedom, as set forth in Section 3.1.2 of Hamline's Faculty Handbook.

More broadly, it is inherently improbable that an art history professor who displayed highly regarded, centuries-old Muslim paintings of the Prophet Muhammad in an Islamic Art unit of an undergraduate World Art History course, with advance warning and with time for students to disengage from the material before showing it, did so because of fear, hatred, or aversion of Muslims (Islamophobia); because of "intolerance" toward Muslims; to provoke, offend, and hurt Muslim students; or because she does not value Muslims the same as other minorities. Hamline has since issued a statement in which it admits that its use of the term Islamophobia was "flawed." Statement, Hamline University Board of Trustees Chair Ellen Watters and University President Fayneese Miller, January 17, 2022, available at https://www.hamline.edu/news/2023/01/statements-hamline-university-january-2023-present (last visited Mar. 29, 2023). This shows the recklessness of the original accusations. Thus, even if López Prater were a limited purpose public figure, Hamline's motion must be denied.

### C.   *Hamline Has No Qualified Privilege.*

Hamline's argument that Everett's republication of Hussein's defamatory statements is protected by the common law qualified privilege must be rejected. Affirmative defenses, such as the qualified privilege in defamation actions, are generally not a basis for a motion to dismiss unless the complaint clearly shows the existence of the defense. *See United States v. Xcel Energy, Inc.*, 759 F. Supp. 2d 1106, 1118 (D. Minn. 2010). López Prater's Complaint does not clearly show the existence of the defense.

A statement is protected by qualified privilege if it was "made in good faith and . . . upon a proper occasion, from a proper motive, and . . . upon reasonable or probable cause." *Bol v. Cole*, 561 N.W.2d 143, 149 (Minn. 1997) (citation and internal quotation marks omitted). It cannot be said from the facts alleged in López Prater's Complaint that Hussein—who is not an art historian and never met or spoke to López Prater—had "reasonable or probable cause" to assert that López Prater's motives for showing the paintings at issue in a World Art History Class included fear, hatred, or aversion of Muslims; the desire to provoke, offend, and hurt Muslim students; or because she does not value Muslims the same as other minorities.[7]

---

[7] It is worth noting here that López Prater also has ample evidence that Hussein's statements were made in bad faith and with improper motive. As just one of many examples, Hussein has contended in the media that "[i]n reality a trigger warning is an indication that you are going to do harm." *See* Nina Moini, *Hamline student, former instructor at center of debate over religion, academic freedom speak out*, MPR, Jan. 11, 2023, available at https://www.mprnews.org/story/2023/01/11/hamline-student-former-instructor-at-center-of-debate (last visited Mar. 29, 2023). According to Hussein, the fact that López Prater provided advance notice and an opportunity to disengage from the materials before displaying the images of Muhammad, is not evidence of her sensitivity

Furthermore, "A qualified privilege is abused and therefore lost if the plaintiff demonstrates that the defendant acted with actual malice." *Lewis v. Equitable Life Assurance Soc'y of U.S.*, 389 N.W.2d 876, 890 (Minn. 1986). To show actual malice in this common law sense (as opposed to the Constitutional sense), a plaintiff must show that the statements were "made . . . from ill will and improper motives, or causelessly and wantonly for the purpose of injuring [her]." *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 920 (Minn. 2009). For the reasons discussed *supra*, at pp. 33-34, it cannot be said from López Prater's allegations that Hussein lacked ill will or improper motives, or that he did not act carelessly or wantonly for the purpose of injuring her.

Similarly, it cannot be said from the allegations in López Prater's Complaint that Everett acted in good faith, with proper motive, or upon reasonable and probable cause when republishing Hussein's statements. In fact, the Complaint alleges just the opposite: that Everett was aware of facts proving Hussein's statements about López Prater were false. (Compl., Doc. 1-3, at ¶ 34.) Those same facts support a plausible inference that Everett republished Hussein's statements from ill will and improper motives, or causelessly and wantonly for the purpose of injuring López Prater. Hamline's motion to dismiss López Prater's defamation claim must accordingly be denied.

---

and consideration for Muslim beliefs, as it would appear to most, but evidence that López Prater maliciously hoped to offend, or in his lingo, "harm," Muslim students. Plaintiff respectfully submits that Hussein's wildly unreasonable argument plainly evinces an intent to deceive or mislead others to gain some perceived advantage, *i.e.*, his bad faith. *See* Bad Faith, Black's Law Dictionary (11th ed. 2019).

## IV.     HAMLINE INTENTIONALLY INFLICTED EMOTIONAL DISTRESS.

Under Minnesota law, intentional infliction of emotional distress requires proof that: "(1) the conduct complained of was extreme and outrageous; (2) the conduct was intentional or reckless; (3) the conduct caused emotional distress; (4) and the distress suffered was severe." *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 663 (Minn. 1999) (citing *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438-39 (Minn. 1983)). Conduct is "extreme and outrageous" when it is "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Hubbard*, 330 N.W.2d at 439 (internal quotation omitted). "Liability for intentional infliction of emotional distress does not extend to 'insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 865 (Minn. 2003) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). To qualify as extreme and outrageous, the conduct must lead an average member of the community to exclaim "Outrageous!" *Id.*

López Prater's Complaint sets forth facts that establish extreme and outrageous conduct. Hamline's conduct was extreme and outrageous in part because López Prater **did nothing wrong**. She informed students in the course syllabus that images of the Prophet Muhammad would be shown in class and invited them to contact her in advance if they thought it would affect their attendance or participation in class. She ran the syllabus by her department chair and Hamline administration, who said nothing. The images she displayed were centuries-old masterpieces, made by Muslims for Muslims, that are widely regarded as canonical by professors of Islamic art, and are displayed in museums, textbooks, and art history classes across the world, including by Muslim professors. She

37

showed them for a plainly educational purpose, and provided students advance notice before advancing to the presentation slides so they could avoid viewing the paintings if they so wished.

For this—doing her job by teaching art history to students in an art history course in a thoughtful, considerate, inclusive manner—and despite her pleas to keep the matter quiet, Hamline non-renewed her adjunct professor contract, falsely accused her of being motivated by Islamophobia in an email to the entire campus, falsely asserted in the student newspaper that her conduct was motivated by "intolerance," announced her coming separation in the student newspaper before she was done teaching her course (leaving her to continue teaching her course to students who all knew she was being fired), ostracized López Prater, allowed Hussein to defame and disparage López Prater while simultaneously seeking to quash dissenting viewpoints during a "Community Conversation," and then republished Hussein's defamatory statements in an email to the entire campus.[8] Hamline's completely undeserved opprobrium spread across the globe in the press and on the internet, forever associated with López Prater. Unsurprisingly, others have cried "Outrageous!" on López Prater's behalf.[9] *See Langeslag*, 664 N.W.2d at 865. Hamline's attempt to equate its actions with mere "harassment" or "ridicule" greatly understates the extreme and outrageous nature of its conduct and should be roundly rejected.

---

[8] The facts in the Complaint also give rise to a reasonable inference that Hamline sought to silence Berkson's defense of López Prater by causing or pressuring the student newspaper to remove his article from publication. Whether such conduct in fact occurred will be explored in discovery.

[9] The articles cited in paragraphs 51 and 67 of Plaintiff's Complaint are representative examples.

With respect to the fourth element of her claim, López Prater has set forth facts that plausibly establish that she suffered severe emotional distress because of Hamline's conduct. That severe emotional distress is pled in paragraphs 38, 52, and 93 of López Prater's Complaint,[10] and can also be reasonably inferred from the magnitude and outrageousness of Hamline's conduct toward her, the world-wide publicity the matter received, and the fact that López Prater had only recently embarked on her post-doctorate academic career before Hamline's campaign of defamation, ostracism, and humiliation. As mentioned previously, Hamline's public accusations are among the worst one can publicly level against a recently graduated Ph.D. hoping for a tenure-track career at a United States university. López Prater's pleadings and her claim for intentional interference with emotional distress thus differ from the two unpublished cases cited by Hamline in support of its argument. *See Cherry v. MCF-Moose Lake*, 22-CV-2012 (JRT/JFD), 2023 WL 1767832 (D. Minn. Jan. 17, 2023) (unsupported allegation that the punishment he received for handing a letter to a prison guard caused "extreme emotional distress" was insufficient by itself to support that prison inmate had, in fact, suffered extreme emotional distress); *Leiendecker v. Asian Women United of Minnesota*, 834 N.W.2d 741, 754 (Minn. Ct. App. 2013), *rev'd*, 848 N.W.2d 224 (Minn. 2014), as modified (Sept. 3, 2014), *reh'g granted, opinion modified*, 855 N.W.2d 233 (Minn. 2014) (conclusory allegation of extreme emotional distress insufficient to support that the defendant intentionally inflicted emotional distress by bringing lawsuits against the plaintiff in connection with a business

---

[10] Under Fed. R. Civ. P. 8 and 9, López Prater is not required to plead her emotional distress with specificity.

dispute). Hamline's motion to dismiss López Prater's claim for intentional infliction of emotional distress must be denied.

## V.   HAMLINE RETALIATED AGAINST PLAINTIFF IN VIOLATION OF THE MINNESOTA WHISTLEBLOWER ACT.

The Minnesota Whistleblower Act ("MWA") provides in relevant part:

An employer shall not discharge, discipline, threaten, otherwise discriminate against, or <u>penalize</u> an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:

(1) the employee, or a person acting on behalf of an employee, in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official;

Minn. Stat. § 181.932, subd. 1. "Penalize" means "conduct that might dissuade a reasonable employee from making or supporting a report . . . ." *Id.* § 181.931, subd. 5. Discriminatory or retaliatory decisions and actions that negatively affect an employee's career prospects sufficiently change the terms and conditions of employment as to constitute an adverse employment action. *See Jackman v. Fifth Judicial Dist. Dept. of Corr. Services*, 728 F.3d 800, 804 (8th Cir. 2013); *Benner v. St. Paul Pub. Sch., I.S.D. #625*, 380 F. Supp. 3d 869, 895–96 (D. Minn. 2019); *Eldredge v. City of St. Paul*, 809 F. Supp. 2d 1011, 1033 (D. Minn. 2011).

To establish a prima facie case under the Minnesota Whistleblower Act ("MWA"), an employee must show: 1) she engaged in protected conduct; 2) she was subject to an adverse action; and 3) a causal connection between the two. *Cokley v. City of Otsego*, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001). Causal connection can be established by direct evidence, or indirectly by evidence of circumstances that justify an inference of retaliatory

motive, such as a showing that the employer has knowledge of the protected activity, and the adverse employment action follows closely in time. *Hubbard v. United Press Intern., Inc.*, 330 N.W.2d 428, 445 (Minn. 1983).

An employee engages in protected conduct under the MWA by making a good faith report to the employer of a violation or suspected violation of statutory, regulatory, or common law. Minn. Stat. § 181.932, subd. 1(1). López Prater engaged in protected conduct on November 18, 2022, when she emailed Kostihova and Baker and told them that the "public allegations of Islamophobia" were "defamatory." (Compl., Doc. 1-3, at ¶¶ 43-44, 97.) It is a report of a violation of common law.

Shortly thereafter, Hamline penalized López Prater in the terms, conditions, and privileges of employment by engaging in conduct that would tend to dissuade any reasonable person from engaging in protected conduct under the MWA, and which can be expected to negatively affect López Prater's career prospects. Hamline falsely asserted she was motivated by "intolerance" in the student newspaper, announced her coming separation in the student newspaper before she was done teaching her course (leaving her to continue teaching her course to students who all knew she was being fired), allowed Hussein to defame and disparage López Prater while simultaneously seeking to quash dissenting viewpoints during a "Community Conversation," and then republished Hussein's defamatory statements in an email to the entire campus. Hamline's motion to dismiss López Prater's MWA claim should be denied.

## **CONCLUSION**

Hamline's removal of this action, and this motion to dismiss, were made simply for the purpose of delaying the day when Hamline must reckon with the bigoted and reprehensible way it has treated López Prater. The Court should not countenance any further delay by Hamline. López Prater thus respectfully requests the Court deny Hamline's motion to dismiss with as little delay as practicable.

Respectfully submitted;

Dated: 3-29-2023

/s/ David H. Redden
David H. Redden, #391496
Nicholas G. B. May, #287106
Adam A. Gillette, #328352
Attorneys for Erika López Prater
**FABIAN MAY & ANDERSON, PLLP**
1625 Medical Arts Building
825 Nicollet Mall
Minneapolis, MN 55402
Telephone: (612) 353-3340
dredden@fmalawyers.com
nmay@fmalawyers.com
agillette@fmalawyers.com