UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Erika López Prater,

              Plaintiff,

v.

Trustees of the Hamline University of
Minnesota,

              Defendant.

Case No. 23-cv-00505 (KMM/DJF)


**ORDER**

---

This matter is before the Court on Plaintiff Erika López Prater's Motion to Remand this case to Minnesota state court [ECF No. 13.], and Defendant Trustees of the Hamline University of Minnesota's ("Hamline") Motion to Dismiss Ms. López Prater's Complaint. [ECF No. 7.]  For the reasons set forth below, Ms. Lopez's motion is **DENIED**, and Hamline's motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.      Background

The dispute arises out of the non-renewal of Ms. López Prater's employment contract to teach at Hamline during the Spring of 2023.  Hamline hired Ms. López Prater as an Undergraduate Adjunct Instructor to teach a World Art class for the Fall 2022 semester. [Complaint ("Compl."), ECF No. 1-3, ¶ 4.]  Her employment at Hamline was subject to the policies set forth in Hamline's Faculty Handbook.  [*Id.* at ¶ 64.]  Upon her acceptance of Hamline's offer of appointment on August 8, 2022, she became a Service Employees International Union Local 284 ("Union") Unit Member covered by a Collective Bargaining Agreement for Certain Undergraduate Adjunct Faculty ("CBA").  [Notice of Removal, ECF

1

No. 1, ¶ 1.]  Ms. López Prater acknowledged the requirement that she become a Unit Member of the Union in an email to her supervisor and department chair of the Art and Digital Media Department, Allison Baker, in September 2022.  [*Id.* ¶ 4.]  Later that month, Ms. Baker asked Ms. López Prater if she was interested in teaching a contemporary art class during the spring semester, and Ms. López Prater indicated that she was.  [Compl. ¶ 12.] Hamline listed the class as a course offering for the spring.  [*Id.* ¶ 13.]

Ms. López Prater is not Muslim but knew that some Muslims object to viewing art containing images of the Prophet Muhammad.  [*Id.* ¶ 5.]  In October 2022, as part of a unit on Islamic art, Ms. López Prater showed two paintings displaying the Prophet Muhammad during a class conducted remotely over Zoom.  [*Id.* ¶¶ 14, 15.]  According to the Complaint, it is undisputed that both paintings were made with great reverence for the Prophet Muhammad, and Ms. López Prater warned students before showing the paintings.  [*Id.*, ¶. 19] During class, a Muslim student, Aram Wedatalla, viewed the paintings and was offended by them.  [*Id.* ¶ 20.]  Ms. Wedatalla stayed on the video call after the other students left and expressed outrage to Ms. López Prater that images of the Prophet Muhammad were displayed. [*Id.*]  After the conversation ended, Ms. López Prater emailed Ms. Baker to explain what happened in class and alerted Ms. Baker that Ms. Wedatalla might contact her.  [*Id.* ¶ 22.]  Ms. Baker responded via email saying, "I'm sorry that happened and it sounded like you did everything right. I believe in academic freedom, so you have my support but thank you for the heads up."  [*Id.*]

On October 7, 2022, Ms. Baker notified Ms. López Prater that Ms. Wedatalla had complained to Marcela Kostihova, the Dean of Hamline's College of Liberal Arts.  [*Id.* ¶ 23.]

Ms. Baker told Ms. López Prater that sending Ms. Wedatalla an email apologizing for making her feel uncomfortable would be a good idea, but not to backpedal on her right to academic freedom under Hamline's policy.  [*Id.*]  Ms. López Prater drafted an email and provided it to Ms. Baker to review.  [*Id.* ¶ 24.]  After receiving Ms. Baker's suggested edits, Ms. López Prater sent an email apologizing that the images made Ms. Wedatalla uncomfortable.  [*Id.*]  Ms. Wedatalla did not respond to the email, but allegedly shared it others. [*Id.* ¶ 25.]

Around October 10, Ms. López Prater had two discussions with Dean Kostihova. [Compl. ¶ 26.]  During the first conversation, Dean Kostihova told Ms. López Prater that it was not a good idea for her to have shown images of the Prophet Muhammad.  [*Id.*]  Dean Kostihova informed Ms. López Prater that there had been a significant outcry within the Muslim Student Association as well as by Muslim faculty and staff and that Muslim staff were threatening to resign.  [*Id.*]  Dean Kostihova recommended that Ms. López Prater apologize in class.  [*Id.*]  During their second conversation, Ms. López Prater expressed concern about the damage the situation may cause to her career.  [*Id.* at 27.]  She also explained that excluding Muslim paintings of the Prophet Muhammad would be discriminatory because it would privilege the religious views of Muslims who object to viewing depictions of the Prophet Muhammad over those of Muslims who do not object.  [*Id.*]

During class on October 11, Ms. López Prater apologized to her students and asked if anyone would like to discuss the situation further.  [*Id.* ¶ 28.]  No one responded to her invitation, and she informed them that she was open to having a conversation later if they were uncomfortable discussing the matter during class.  [*Id.*]  Despite her apologies, around October 24, Ms. Baker notified Ms. López Prater that the class she had been scheduled to

teach during the spring semester was being canceled and that her contract would not be renewed.  [*Id.* ¶ 29.]  Ms. Baker wrote:

> We have deeply appreciated the breadth of knowledge you have brought to Hamline this semester but as a department we need to make a spring semester change and will no longer be able to offer the contemporary art history class online as we had previously discussed.

[*Id.*]

On November 7, 2022, while Ms. López Prater was still employed by Hamline, Associate Vice President of Inclusive Excellence, David Everett, Ph. D., sent the following email to all Hamline employees and students:

> Several weeks ago, Hamline administration was made aware of an incident that occurred in an online class. Certain actions taken in that class were undeniably inconsiderate, disrespectful, and Islamophobic. While the intent behind those actions may not have been to cause harm, it came at the expense of Hamline's Muslim community members. While much work has been done to address the issue in question since it occurred, the act itself was unacceptable.  ***  I want to make it clear: isolated incidents such as we have seen define neither Hamline nor its ethos. They clearly do not meet community standards or expectations for behavior. We will utilize all means at our disposal, up to and including the conduct process, to ensure the emotional health, security and well-being of all members of our community.

[Compl. ¶ 33.]

On November 18, Hamline's student newspaper, *The Oracle*, published a staff editorial titled, "Incidents of hate and discrimination."  [*Id.* ¶ 42.]  The article did not name Ms. López Prater but repeated the assertion from Dr. Everett's email that what occurred in the October 6 class was "Islamophobic."  [*Id.*]  The article also stated that the incident "harmed and traumatized" individuals in the Muslim community. [*Id.*]  Later that day, Ms. López Prater sent

an email to Dean Kostihova and Ms. Baker calling out Dr. Everett's campus-wide email as defamatory.  [*Id.* ¶ 44.]

Around this time, Dean Kostihova informed Ms. López Prater that *The Oracle* was interviewing people about the events from her October 6 class and intended to publish another article about it.  [Compl. ¶ 40.]  Dean Kostihova informed her that the article would not include her name.  [*Id.*]  However, Ms. López Prater was the only art historian on campus teaching the only art history class that semester.  Ms. López Prater asked that *The Oracle* not run its intended article about her October 6th class.  [*Id.* ¶ 44.]  But *The Oracle* nonetheless published the article on December 6.  [*Id.* ¶ 45.]  Multiple Hamline officials were quoted in the article.  Hamline's Dean of Students stated that Ms. López Prater's conduct was "an act of intolerance," and the Assistant Director of Social Justice Programs and Strategic Relations said that Ms. López Prater's showing of the paintings was "something that in a million years, [he] never expected . . . would happen . . . at Hamline."  [*Id.* ¶¶ 47, 48.]  Dr. Everett told *The Oracle* that because of the incident, it was decided that "it was best that this faculty member was no longer part of the Hamline community."  [*Id.* ¶ 49.]

In December 2022, during an in-person "Community Conversation" held on Hamline's campus, Jaylani Hussein, Executive Director of the Minnesota chapter of the Council on American-Islamic relations ("CAIR-MN") made several allegedly defamatory statements about Ms. López Prater.  [*Id.* at ¶ 56.]  Mr. Hussein asserted that Ms. López Prater showed the images of the Prophet Muhammad for no reason other than to "provoke, offend, and hurt" Muslim students, and that doing so was "Islamophobic."  [*Id.*]  Mr. Hussein also asserted that Ms. López Prater showed the paintings because she does not value Muslims the

same as other minorities. [*Id.*] No Hamline official interrupted Hussein's statements. [*Id.* at ¶ 59.] And when Mark Berkson, a Hamline professor and Chair of the Department of Religion, tried to speak up in opposition to Mr. Hussein's statements, two members of Hamline's administration, Ms. Baker and Dr. Everett, placed their hands on his shoulders and told him to stop. [*Id.* at ¶ 57.]

After Hamline decided not to renew Ms. López Prater's contract, it hired a different adjunct instructor to teach a spring semester course entitled "Visual Construction of Gender." [*Id.* ¶ 69.] According to Ms. López Prater, she was qualified to teach the "Visual Construction of Gender" course because she previously taught similar courses at other universities, but she was not asked to teach the spring course at Hamline. [*Id.* ¶ 70.]

Ms. López Prater initially sued Hamline in state court. She asserted several claims: (1) religious discrimination in violation of the Minnesota Human Rights Act ("MHRA"); (2) reprisal in violation of the Minnesota Human Rights Act; (3) breach of contract; (4) promissory estoppel; (5) defamation; (6) intentional infliction of emotional distress ("IIED"); and (7) violations of the Minnesota Whistleblower Act. [*Id.* ¶ 99.] On February 7, 2023, Hamline removed the action to this Court, asserting that Section 301 of the Labor Management Relations Act ("LMRA") preempted Ms. López Prater's state court claims. On February 9, Ms. López Prater voluntarily dismissed her complaint against Hamline.

On February 9, Ms. López Prater served the complaint at issue in this case in state court, removing her breach of contract and promissory estoppel claims. And on March 2, Hamline removed the action to this Court, again asserting that the LMRA preempts Ms. López Prater's state court claims. [Notice of Removal, ECF 1.]

## II.    Motion to Remand

The Court must first consider Ms. López Prater's Motion to Remand because if this Court lacks subject matter jurisdiction, it cannot rule on Hamline's Motion to Dismiss.  The basis for Ms. López Prater's Motion to Remand is that her Complaint asserts only state law claims and is a dispute between two citizens of Minnesota, so no jurisdiction exists in federal court.  Hamline argues that although Ms. López Prater brought state-law claims, because they require interpretation of a CBA they are completely preempted by the LMRA and therefore federal jurisdiction is appropriate.  For the reasons explained below, the Court denies Ms. López Prater's Motion to Remand.

"A defendant's removal of a case to federal court is appropriate only if the action originally could have been filed there." *Junk v. Terminix Int'l Co.*, 628 F.3d 439, 444 (8th Cir. 2010) (internal quotations omitted) (citing 28 U.S.C. § 1441).  After the case is removed, a "plaintiff may move to remand the case if the district court lacks subject matter jurisdiction." *Id.* (citing 28 U.S.C. § 1447(c)).  In the face of a motion to remand, "[t]he defendant bears the burden of establishing federal jurisdiction by a preponderance of the evidence." *In re Prempro Prods. Liab. Litig.*, 591 F.3d 613, 620 (8th Cir. 2010).  If the defendant fails to meet that burden, the district court must remand the case.  28 U.S.C. § 1447(c).  "All doubts about federal jurisdiction should be resolved in favor of remand to state court." *In re Prempro*, 591 F.3d at 620.

Hamline asserts federal question jurisdiction as the hook for removal in this case. Federal question jurisdiction applies to actions "arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  When assessing whether federal question jurisdiction

exists, the Court must employ the "well-pleaded complaint rule" and look only to the face of the complaint. *Gore v. Trans World Airlines*, 210 F.3d 944, 948 (8th Cir. 2000) (citing *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987)).

Generally, courts do not have federal question jurisdiction based on a defense, even if the defense relies on federal law. *Id.* However, one exception is complete preemption, where a statute "so completely pre-empt[s] a particular area that any civil complaint raising this select group of claims is necessarily federal." *Johnson v. MFA Petroleum Co.*, 701 F.3d 243, 247 (8th Cir. 2012) (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 64 (1987)). "A conclusion that there is complete preemption effectively maintains that the plaintiff has simply brought a mislabeled federal claim, which may be asserted under some federal statute." *Id.* (internal quotations and citations omitted). "Only those claims that fall within the preemptive scope of the particular statute . . . are considered to make out federal questions . . . but the presence of even one federal claim gives the defendant the right to remove the entire case to federal court. *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 543 (8th Cir. 1996). Complete preemption is rare, and the LMRA is one of the few statutes that can completely preempt state-law claims. *Boldt v. N. States Power Co.*, 904 F.3d 586, 590 (8th Cir. 2018).

Hamline argues that Ms. López Prater's claims are preempted by the LMRA. [Memorandum in Opposition, ECF No. 21, at 5.] Section 301(a) of the LMRA creates a federal cause of action for "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185(a). The Supreme Court has held that any state law claim founded on rights created by a CBA is preempted under section 301, *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 102–03 (1962), as well

as any claim whose resolution is substantially dependent upon or "inextricably intertwined" with interpretation of the terms of such an agreement, *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 213, 220 (1985).

That said, "section 301 does not preempt state law claims merely because the parties involved are subject to a CBA and the events underlying the claim occurred on the job." *Williams v. Nat'l Football League*, 582 F.3d 863, 874 (8th Cir. 2009). *See also Lueck*, 471 U.S. at 211 ("Of course, not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301."); *Graham v. Contract Transp., Inc.*, 220 F.3d 910, 913 (8th Cir. 2000) (providing that "a claim is not preempted simply because it relates to a dispute in the workplace"). An otherwise independent claim will not be preempted if the CBA need only be consulted during its adjudication. *Trs. of the Twin City Bricklayers Fringe Benefit Funds v. Superior Waterproofing, Inc.*, 450 F.3d 324, 330 (8th Cir. 2006). "[T]he crucial inquiry is whether resolution of a state-law claim depends upon the meaning of a [CBA]." *Miner v. Local # 373s*, 513 F.3d 854, 865 (8th Cir. 2008) (internal quotations and citations omitted). In essence, if any of Ms. López Prater's state-law claims are preempted by the LMRA, and thus raise federal questions, then this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and must deny Ms. López Prater's Motion to Remand. If, however, her claims are not preempted, then they are true state-law claims and this Court does not have subject matter jurisdiction over them, so it must grant her motion.

When applying LMRA preemption, courts begin with "the claim itself," and "apply a two-step approach in order to determine if the claim is sufficiently independent to survive." *Williams*, 582 F.3d at 874 (internal quotations and citations omitted). First, "a state-law claim

9

is preempted if it is based on a provision of the CBA, meaning that the CBA provision at issue actually sets forth the right upon which a claim is based." *Id.* (cleaned up). "Second, section 301 preemption applies where a state-law claim is dependent on an analysis of the relevant CBA," meaning that the claim requires interpretation of a provision of the CBA. *Id.* (cleaned up). The Court concludes that preemption applies here under the second prong because at least one of Ms. López Prater's claims require interpretation of the CBA and thus vest this court with federal question jurisdiction.

Ms. López Prater's Complaint makes the following assertions: Hamline offered Plaintiff a teaching appointment for spring 2023, which she accepted [*Id.* ¶ 12]; Hamline listed the course Plaintiff was appointed to teach [*Id.* ¶ 13]; after the October 6, 2022 incident wherein she displayed paintings of the Prophet Muhammad to her class, Hamline cancelled the teaching appointment and failed to renew her teaching contract for spring 2023 [*Id.* ¶¶ 29, 78, 85, 98]; Hamline announced her non-renewal before her last day of class [*Id.* ¶¶ 49, 52, 85, 93]; she objected to the lack of due process [*Id.* ¶ 43]; and Hamline violated her academic freedom [*Id.* ¶¶ 63–65, 68, 85, 98]. Ms. López Prater relies on these facts, among others, to support her claims for religious discrimination under the MHRA, reprisal in violation of the MHRA, intentional infliction of emotional distress, and violation of the Minnesota Whistleblower Act. [*Id.* at ¶¶ 71–87, 92–99.]

Many of these allegations involve provisions of the CBA that covered Ms. López Prater's employment. The relevant sections include the following:

> Article 4, Section 1: Hamline University "retains all rights pertaining to administration or management of the University as a whole and at each and every level, school, program and department or other part of the University, including, but not limited to, the rights: . . . to assign duties and direct Unit

Members; to determine and modify the number, qualifications, hiring criteria, scheduling, responsibilities and assignment of Unit Members; to provide Unit Members individually with a letter of appointment; to establish, maintain, modify or enforce standards of performance, conduct, order and safety; . . . to recruit or hire Unit Members; to determine how and when and by whom instruction is delivered and other services at the University are performed . . . ." [ECF 1-1, Art. 4, § 1.]

Article 4, Section 2 of the CBA provides, "Decisions regarding who is taught, what is taught, how it is taught and who does the teaching involve academic judgment and shall be made at the sole discretion of the [Defendant], except to the extent, if any, of direct conflict between such exercise and an explicit provision of this [CBA]." [*Id.* at Art. 4, § 2.]

Article 5 of the CBA concerns "Academic Freedom" of Unit Members such as Ms. López Prater. [*Id.* at Art. 5.]

Article 12 of the CBA concerns "Equal Employment Opportunity and Non-Discrimination" of Unit Members such as Plaintiff. [*Id.* at Art. 12.]

Article 14 of the CBA concerns the "Grievance and Arbitration" Procedure under the CBA. [*Id.* at Art. 14.]

Article 14, Section 1 provides, "A grievance within the meaning of this [CBA] shall be any dispute concerning the interpretation or application of this [CBA] . . . . This procedure shall be the sole and exclusive means for enforcing the terms of this [CBA] . . . ." [*Id.* at § 1.]

Article 15 of the CBA, entitled Appointment of Courses, dictates how and when Defendant makes appointments of courses to Unit Members such as Plaintiff. Article 15 further states that the "University has the right to exercise sole discretion over all matters related to the academic curriculum of the University, circumscribed only by the principles of academic freedom." [*Id.* at Art. 15, §§ 1, 6.]

Article 23 of the CBA provides that it "sets forth the minimum standards to be observed by the University and the Union with respect to terms and conditions of employment for Unit Members." [*Id.* at Art. 23.]

Whether Hamline offered Ms. López Prater a teaching appointment for spring 2023 is impacted by Articles 4 and 15 of the CBA.  Hamline listing the course Ms. López Prater was appointed to teach relates to Article 15.  Hamline's cancellation of Ms. López Prater's teaching appointment for spring 2023 and nonrenewal before the last day of class implicate from Articles 4, 12, 15, and 23.  Allegations that Hamline violated Ms. López Prater's academic freedom certainly relate to Article 5. And arguably Ms. López Prater's entire dispute with Hamline is impacted by Article 14.

Ms. López Prater cites *Thomas v. Union Pacific R.R. Co.*, 308 F.3d 891, 893 (8th Cir. 2002), to support her position that her claims do not require interpretation of the CBA.  In *Thomas*, employees brought a claim for whistleblower retaliation.  *Id.* at 893.  The Eighth Circuit held that while the collective bargaining agreement would undoubtedly be referred to during the case, the retaliation claim did not involve interpretation of that agreement.  *Id.* at 894–95. While *Thomas* is instructive, it does not control the question of whether Ms. López Prater's claims will be dependent upon analysis and interpretation of the CBA in *this* case.  Indeed, with respect to Ms. López Prater's MHRA claim for religious discrimination, *Thomas* and other Eighth Circuit decisions weigh in favor of finding that interpretation of the CBA will be required here.

*Boldt v. Northern States Power Co.*, 904 F.3d 586 (8th Cir. 2018), in particular, is helpful when analyzing whether Ms. López Prater's MHRA religious discrimination claim requires interpretation of the CBA.  In *Boldt*, the Eighth Circuit affirmed the denial of the plaintiff's motion to remand, holding that under the *McDonnell Douglas* framework for employment discrimination claims, the plaintiff could not establish the first prong, that he was qualified to

work at the company, without addressing whether he was fit for duty, a policy incorporated into the governing CBA. *Id.* at 592. His claims substantially depended upon an interpretation of the CBA terms governing fitness-for-duty, and, as a result, "the case belong[ed] in federal court." *Id.* at 590–92. *Johnson v. Humphreys*, 949 F.3d 413, 416 (8th Cir. 2020), is also instructive. In *Johnson*, the Eighth Circuit found that a plaintiff's prima facia case for race discrimination also required a showing that he was following established rules and practices under the CBA. *Id.* at 416.

Ms. López Prater's religious discrimination claim is not solely based on a theory of direct discrimination. Therefore, like in *Boldt* and *Johnson*, the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), will apply. And among the elements Ms. López Prater will need to prove to establish a prima facie case, is that "[s]he was meeting the legitimate expectations of the employer." *Johnson*, 949 F.3d at 416 (quotations omitted). In her Complaint, Ms. López Prater alleges that "[p]rior to [Plaintiff] showing the two paintings in class, Hamline was satisfied with [Plaintiff]'s job performance. In fact, Hamline offered [Plaintiff] employment with Hamline for the 2023 spring semester." [Compl. ¶ 76.] As in *Boldt* and *Johnson*, Ms. López Prater's allegations that she met the performance expectations of Hamline and that her contract to return in the spring semester was not renewed requires analysis and interpretation of the CBA, specifically Articles 4, 15, 16, and 23. These articles give Hamline discretion when it comes to hiring decisions, dictate how and when Hamline makes appointments of courses to Unit Members, provide criteria for which Unit Members may be evaluated, and set forth the minimum standards with respect to terms

and conditions of employment.  [ECF 1-1, Art. 4, Art. 15, § 1, Art. 16, Art. 23.]  As in *Boldt*, this claim requires interpretation of the CBA.

Although only a single claim needs to satisfy the preemption test to confer federal question jurisdiction, others among Ms. López Prater's claims are preempted as well.  *See Gaming Corp. of Am.*, 88 F.3d at 543 ("Only those claims that fall within the preemptive scope of the particular statute . . . are considered to make out federal questions . . . but the presence of even one federal claim gives the defendant the right to remove the entire case to federal court.")  For her MHRA reprisal and Minnesota Whistleblower Act claims, for instance, she alleges that Hamline violated the acts when it "fail[ed] to renew [Plaintiff]'s contract for the spring 2023 term."  [Compl. ¶¶ 29, 78, 85, 98.]  She asserts that she had an expectation of having her contract renewed for the Spring 2023 term.  Whether Ms. López Prater had a legal expectation of having her contract renewed, and whether Hamline failed to meet that expectation, are dependent upon analysis and interpretation of the CBA.

Additionally, whether Hamline violated Ms. López Prater's guarantee of academic freedom and due process requires analysis and interpretation of Articles 5, 14, and 15.  Article 5 of the CBA concerns "Academic Freedom," Article 14 concerns the "Grievance and Arbitration" procedure under the CBA, and Article 15 states that Hamline "has the right to exercise sole discretion over all matters related to the academic curriculum of the University, circumscribed only by the principles of academic freedom."  [ECF 1-1, Art. 4, Art. 14, Art. 15.]  Finally, Ms. López Prater's allegations that Hamline announced her non-renewal before the end of her term, which underlie her MHRA reprisal and intentional infliction of emotional distress claims ("IIED"), require analysis and interpretation of the CBA, specifically Articles

4 and 15.  These Articles concern when and how a Unit Member, like Ms. López Prater can be renewed or non-renewed.

For these reasons, the Court finds that Ms. López Prater's claims substantially depend upon the interpretation of the CBA, meeting the second prong of the LMRA preemption test. *Boldt*, 904 F.3d at 950.  Therefore, the Court denies Ms. López Prater's Motion to Remand. Hamline properly removed this case, and this Court has subject matter jurisdiction over it.

### III.   Hamline's Motion to Dismiss

Having denied Ms. López Prater's Motion to Remand, the Court now considers Hamline's Motion to Dismiss, which seeks to dismiss her complaint for failure to state a claim under Rule 12(b)(6).  To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This standard does not require the inclusion of "detailed factual allegations" in a pleading, but the complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).  In applying this standard, the Court must assume the facts in the complaint to be true and take all reasonable inferences from those facts in the light most favorable to the plaintiff.  *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986); *see Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019).

The standard announced in *Twombly* and *Iqbal* applies a bit differently in employment discrimination cases.  The Supreme Court in *Swierkiewicz v. Sorema*, 534 U.S. 506 (2002), "negated any need to plead a prima facie case" in such cases and "emphasized that the prima

facie model is an evidentiary, not a pleading, standard." *Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 796 (8th Cir. 2021) (quoting *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016)). After *Twombly* and *Iqbal*, the elements of a prima facie case of discrimination are still relevant in evaluating a Rule 12(b)(6) motion, but they are more properly considered "part of the background" of the plausibility determination or "as a prism to shed light upon the plausibility of the claim." *Blomker*, 831 F.3d at 1056 (quotation omitted). "The bottom line is that plaintiff need not plead facts establishing a prima facie case" under the *McDonnell Douglas* framework to defeat a motion to dismiss. *Ratfield v. Delta Air Lines, Inc.*, No. 22-CV-2212 (KMM/DLM), 2023 WL 5178593, at *17 (D. Minn. Aug. 11, 2023) (quotation omitted).

### A. MHRA Claim for Religious Discrimination

The MHRA, among other things, makes it unlawful for an employer to discriminate against a person with respect to hiring, tenure, compensation, terms, conditions, or privileges of employment because of religion. Minn. Stat. §§ 363A.08, subd. 2(1), 2(3). Generally, courts construe the MHRA in accordance with Title VII, though the MHRA historically has "provided more expansive protections to Minnesotans." *Kenneh v. Homeward Bound, Inc.*, 944 N.W.2d 222, 229 & n.2 (Minn. 2020) (describing differences). The MHRA does not define "religion" or "because of . . . religion," but Title VII construes the term "religion" to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j).

The parties agree that Ms. López Prater does not allege direct evidence of discrimination and therefore must prove her claim through circumstantial evidence under the *McDonell-Douglas* burden-shifting framework. To establish a prima facie case of religious discrimination, she must show that "(1) she is a member of a protected class because of her

religious beliefs, (2) she met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination." *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 887 (8th Cir. 2015) (citing *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)); *see also Hanson v. Mental Health Res., Inc.*, 948 F. Supp. 2d 1034, 1047 (D. Minn. 2013) ("MHRA claims that do not involve direct evidence of discrimination are analyzed under the *McDonnell Douglas* framework.").

Ms. López Prater alleges two theories of religious discrimination: 1) discrimination because she is not Muslim, and 2) discrimination because she failed to conform to certain religious beliefs of others (*i.e.,* that it is improper to view images of the Prophet Muhammad). As to the "not Muslim" theory, Hamline argues that she fails to allege membership in a protected class and fails to show that circumstances permit an inference of discrimination. As to her failure-to-conform theory, Hamline contends that she cannot show that Hamline itself had the religious beliefs at issue, and that her theory based upon student preference is unavailing. Although the Court appreciates that Ms. López Prater alleges unusual and somewhat indirect theories for religious discrimination, it does not believe that novelty in this context equates to failure to state a claim. Given the lens applicable at this stage, where a plaintiffs' allegations are taken as true, dismissal is not appropriate.

**Membership in a Protected Class**

Contrary to Hamline's position, the Court finds that Ms. López Prater plausibly alleges that Hamline discriminated against her because she was not a Muslim or did not conform to a belief that certain Muslims share. As to the first element, a plaintiff typically must allege membership in a protected class. In this case, Ms. López Prater's theory for how she falls

within a protected class is a somewhat novel one. She explains that she is "not Muslim," and argues that Hamline would not have fired her for displaying images of the Prophet Muhammad if she were Muslim. [Compl. at ¶ 5; *see also* Mem. Opp'n 21, ECF 20.] She argues that discrimination against a person for *not* belonging to a particular religion falls within the plain language of the MHRA's proscription against employment discrimination "because of … religion," and that "all aspects of religious observance and practice, as well as belief" must necessarily include the lack of observance, practice, and belief. *See* Minn. Stat. ¶ 363A.08, subd. 2; 42 U.S.C. § 2000e(j).

Support for her argument that a protected class can be framed in terms of "not" subscribing to certain religious beliefs can be found in *Campos v. City of Blue Springs*, 289 F.3d 546, 550–51 (8th Cir. 2002). There, an employee informed her supervisor that she observed tenets of Native American spirituality, rather than Christianity. *Id.* at 549. After this conversation, the supervisor treated the employee poorly, subjecting her to months of harassment and criticism because the supervisor wanted a Christian in the employee's position. *Id.* at 549–50. The Eighth Circuit affirmed the jury verdict in favor of the employee, explaining that she "was forced to quit because she was *not a Christian*." *Id.* at 551 (emphasis added). *Campos* demonstrates that it is possible for a plaintiff to succeed in bringing a religious discrimination claim based on not subscribing to a particular religion. *See also McIntire v. Keystone RV Co.*, No. 3:10-CV-508, 2011 WL 5434242, at *1 (N.D. Ind. Nov. 9, 2011) (denying motion to dismiss and holding that plaintiff plausibly alleged that he was discriminated against for being "non-Amish").

18

Additionally, when evaluating discrimination claims framed in terms of not being a member of a certain religion or not conforming to the beliefs of a certain religion, some courts have dispensed with the need to plead membership in a protected class altogether, reasoning that it does not fit the particular contours of "reverse religious" discrimination claims. *See, e.g.*, *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007) (holding that the "protected class" element required in a traditional discrimination claim does not apply to non-adherence or reverse religious discrimination claims); *Venters v. City of Delphi*, 123 F.3d 956, 972 (7th Cir. 1997); *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1170 (7th Cir. 1998); *Peters v. Cosco & Assocs., Inc.*, Case No. 3:20cv5785-TKW-EMT, 2022 WL 19408073, at *5 (N.D. Fla. Jan. 19, 2022) (collecting cases).

In one of the earliest cases recognizing a plaintiff's ability to plead a religious discrimination case based on not being a member of a certain religion or non-conformance to a certain religious belief, the Tenth Circuit discussed the applicability of the *McDonnell Douglas* elements to allegations that Mormon supervisors discriminated against the non-Mormon plaintiff:

> [U]se of the "protected class" factor in this case would be misleading because it suggests some identifiable characteristic of the plaintiff in order to give rise to Title VII protection . . . . Where discrimination is not targeted against a particular religion, but against those who do not share a particular religious belief, the use of the protected class factor is inappropriate.  Second, because the discrimination is targeted against non–Mormons, and non–Mormons constitute a majority of society, the case resembles those cases of reverse discrimination in which this court has applied a modified *McDonnell* test.

*Shapolia v. Los Alamos Nat. Lab'y*, 992 F.2d 1033, 1038 (10th Cir. 1993); *see also Goins v. W. Grp.*, 635 N.W.2d 717, 724 (Minn. 2001) ("The *McDonnell Douglas* elements 'vary with the

circumstances of the alleged discrimination.'") (quoting *Jones v. Frank*, 973 F.2d 673, 676 (8th Cir. 1992)).

In the face of this authority, the Court declines Hamline's suggestion that Ms. López Prater needs to rely on an affirmative allegation as to her religious beliefs rather than a lack thereof in establishing a prima facie case of religious discrimination. Ms. López Prater may have difficulty proving her case at later stages, especially because demonstrating that Hamline would have treated her differently if she was Muslim seems very hard to establish. But the sole question before the Court at *this* stage is whether her allegations plausibly state a claim for relief, and Hamline bears the burden of dismissal. Though neither side has been able to identify a case with facts closely matching hers, that does not mean that Ms. López Prater fails to state a discrimination claim plausibly or that the MHRA does not protect against the particular form of religious discrimination that she alleges occurred here.

Hamline contends that even if Ms. López Prater's protected class of "not Muslim" was enough, she did not allege that Hamline was aware that she was not Muslim. But the Court must assume the facts in the complaint are true and take all reasonable inferences in the light favorable to Ms. López Prater. *Waters*, 921 F.3d at 734. Here, her complaint contains many suggestions that Hamline knew she was not Muslim. For instance, in explaining why Muslim students were upset that she had showed images of the Prophet Muhammad, Dean Kostihova told her it was like using the "n word" in class in front of Black students. [Compl. ¶ 26.] It is reasonable to infer that if an administrator felt it necessary to explain why the conduct offended individuals of a certain religion, that administrator knows that the teacher does not belong to that religion. Additionally, in the campus-wide email sent by Associate Vice

20

President of Inclusive Excellence David Everett, he explained that actions in Ms. López Prater's class were "Islamophobic" and recognized that even though "the intent behind those actions may not have been to cause harm," they nevertheless "came at the expense of Hamline's Muslim community members." [*Id.* ¶ 33.]   Again, this framing of the event suggested that a non-Muslim instructor unintentionally harmed the Muslim community members.  And Hamline's Dean of Students saying in the student newspaper that Ms. López Prater's conduct was "an act of intolerance" suggests that Ms. López Prater did not tolerate views, beliefs, or behavior that differ from her own.  [*Id.* ¶ 47.]   Further, in the email to all staff, Hamline's President suggested that by showing images forbidden for some Muslims, the instructor did not show "respect for the observant Muslim students in that classroom." [*Id.* ¶ 62.]  This, too, suggests an awareness that Ms. López Prater herself was not Muslim.  It is more than reasonable to infer on the face of this Complaint that Hamline knew that Ms. López Prater was not Muslim.

### Inference of Discrimination

Hamline also argues that Ms. López Prater has not plausibly alleged the fourth element of the *McDonnell Douglas* analysis.  Again here, the Court disagrees.  As a preliminary matter, Hamline suggests that Ms. López Prater must show that Hamline "assigned a nonmember of the protected class to do the same work" to meet this element.  But comparator evidence is just one way to show an inference of discrimination, not the only way.  In *Ballou v. McElvain,* 29 F.4th 413, 424 (9th Cir. 2022), for instance, the Ninth Circuit recently clarified that plaintiffs "may . . . point to comparators as circumstantial evidence of unlawful discriminatory intent" but emphasized that "a relevant comparator is not an *element* of a disparate treatment claim."

*See also T.B. v. Indep. Sch. Dist. 112*, 620 F. Supp. 3d 818, 834 (D. Minn. 2022) (holding same); *Thompson v. Sch. Dist. of Omaha*, 623 F.2d 46, 48–49 (8th Cir. 1980) (finding plaintiff established prima facie case without comparator evidence).

Hamline asserts that the adverse actions were the result of Ms. López Prater's act of showing the images, not her religious beliefs. But accepting that view of the events turns Rule 12(b)(6)'s standard on its head, as it would have the Court take inferences in the light most favorable to Hamline, not Ms. López Prater. Ms. López Prater maintains that Hamline would not have labeled the act of showing the images "Islamophobic" if she were Muslim. She also points to the temporal proximity between the uproar over her showing the images and Hamline's decision not to renew her contract as suggesting a discriminatory motive. Exactly two weeks after Ms. López Prater met with Dean Kostihova and was told that there was a large outcry within the Muslim Student Association and Muslim staff were threatening to resign, she was notified by the department head that the spring semester class she had been scheduled to teach was being cancelled and that her contract would not be renewed. [Compl. ¶¶ 26, 29.] Ms. López Prater responded to that email, suggesting that the change must be related to her showing images of the Prophet Muhammad in class. [Compl. ¶ 30.] The department head did not deny this suggestion. The continued description of her conduct as "Islamophobic" by members of Hamline's administration suggests that it was a problem that Ms. López Prater did not conform to the belief that one should not view images of the Prophet Muhammad for any reason.

The information in Ms. López Prater's complaint is sufficient to plausibly allege that Hamline took the adverse actions because she was not Muslim or did not conform to the

religious beliefs held by some that viewing images of the Prophet Muhammad is forbidden. And while Hamline contends that Ms. López Prater's non-conformance theory must fail—because she did not allege that Hamline itself held those beliefs—caselaw recognizes that an employer can discriminate against an employee if it acts on the preference of third parties such as customers or clients. *See Bradley v. Pizzaco of Nebraska, Inc.*, 7 F.3d 795, 799 (8th Cir. 1993) (pizza franchisor's no-beard policy based on customer preference was discriminatory); *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273, 1274, 1276–77 (9th Cir. 1981) (company could not refuse to hire a woman for a position based on a belief that its clients in other countries may refuse to do business with a woman).[1]  Therefore, Ms. López Prater alleging that Hamline discriminated against her by acting on the preferences of certain Muslim students and staff members is sufficient at this stage.

Finally, even if Ms. López Prater's allegations are lacking with respect to the fourth element, she is not required to allege every element of a prima facie case to survive a motion to dismiss. *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016).  Evidence of a discriminatory intent is more likely to surface through discovery than through the information available to the plaintiff at the time she files her complaint.  Ms. López Prater is not required in her complaint "to rule out every possible lawful explanation for the conduct [she] challenges," as that "would impose the sort of probability requirement at the pleading stage which *Iqbal* and

---

[1] The EEOC has weighed in on this issue and has confirmed its view that "an employer's action based on the discriminatory preferences of others, including coworkers or customers, is unlawful."  U.S. Equal Emp. Opportunity Comm'n, EEOC-CVG-2021-3, EEOC, Compliance Manual, Section 12: Religious Discrimination, 12-II(B), Customer Preference (Jan. 15, 2021), available at https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination (last visited July 26, 2023).

*Twombly* explicitly reject." *Wilson*, 850 F.3d at 373 (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 597 (8th Cir. 2009)). "[S]ummary judgment motions—not motions to dismiss—should dispose of most unmeritorious claims." *Wilson v. Arkansas Dep't of Hum. Servs.*, 850 F.3d 368, 372 (8th Cir. 2017). In arguing that Ms. López Prater fails to state a claim, Hamline relies heavily on cases evaluating motions for summary judgment. Certainly, Ms. López Prater will need more for her case to survive the summary judgment stage. But we are not there yet, and Hamline is free to raise the same arguments when we are. For these reasons, the Court finds Ms. López Prater plausibly alleged a religious discrimination claim under the MHRA and denies Hamline's motion.

### B. MHRA Claim for Reprisal

Hamline next argues that Ms. López Prater's claim for reprisal under the MHRA should be dismissed for failure to state a claim. Like religious discrimination claims, retaliation claims under Title VII and the MHRA are governed by similar standards. *Becker*, 210 F. Supp. 3d at 1118. To survive a motion to dismiss on this claim, a plaintiff must allege facts that when taken as true establish that: (1) the plaintiff engaged in statutorily protected activity, (2) the plaintiff suffered an adverse action by the defendant, and (3) there is a causal connection between the two. *McLain v. Andersen Corp.*, 567 F.3d 956, 969 (8th Cir. 2009); *Bahr v. Capella Univ.*, 788 N.W.2d 76, 81 (Minn. 2010). As to the first element, which Hamline challenges here, a plaintiff's conduct is statutorily protected if the employer's practices were "forbidden" under the MHRA. *Harrell v. Handi Med. Supply, Inc.*, 920 F.3d 1154, 1157 (8th Cir. 2019). And a plaintiff must plead sufficient facts to show that it was objectively reasonable for the plaintiff

to believe that the defendant's actions were forbidden by the MHRA.  *Bahr*, 788 N.W.2d at 82.  The Court concludes that Ms. López Prater fails to plausibly allege the first prong.

Ms. López Prater claims that she engaged in statutorily protected activity by reporting discrimination to Hamline.  Specifically, she describes how in response to Dean Kostihova's criticism of her showing images of the Prophet Muhammad, Ms. López Prater pointed out that excluding the Muslim paintings of the Prophet Muhammad would be discriminatory by privileging the religious views of Muslims who object to depictions of the Prophet Muhammad over other religious beliefs that such images are not forbidden. [Compl. at ¶ 27.]  Ms. López Prater maintains that her statement to Dean Kostihova is protected conduct in opposition to a practice forbidden by the MHRA.  The Court disagrees.  Based on Ms. López Prater's allegations, she did not report to Dean Kostihova (or anyone, for that matter) that actions taken by Hamline were discriminatory, but rather told the Dean that if Ms. López Prater had not shown the images of the Prophet Muhammad, that would have been discriminatory.  No reasonable factfinder could infer from those allegations that she made a report of discrimination that occurred, but rather that she provided an explanation for actions she had already taken.  Because Ms. López Prater fails to allege she engaged in a statutorily protected activity under the MHRA, the Court grants Hamline's Motion to Dismiss her reprisal claim.

### C. Defamation

Hamline asks the Court to dismiss Ms. López Prater's defamation claim because the statements at issue were nonactionable opinion.  To state a claim for defamation in Minnesota, a plaintiff must allege that the defendants made statements that were false, that were communicated to another person, and that harmed the plaintiff's reputation.  *Chang v. Cargill,*

*Inc.*, 168 F. Supp. 2d 1003, 1011 (D. Minn. 2001) (citation omitted); *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919–20 (Minn. 2009). The law is well established that statements of opinion are not actionable as defamation. "The First Amendment protects opinion from defamation liability." *Larson v. Gannett Co., Inc.*, 940 N.W.2d 120, 147 (Minn. 2020) (citing *Diesen v. Hessburg*, 455 N.W.2d 446, 450 (Minn. 1990)). To be nonactionable "pure opinion," a statement is one that "cannot be reasonably interpreted as stating a fact" and "cannot be proven true or false." *McKee v. Laurion*, 825 N.W.2d 725, 733 (Minn. 2013). Courts consider such factors as (1) the specificity and precision of the statement, (2) its verifiability, (3) the literary and social context in which the statement was made, and (4) the public context. *Chang*, 168 F. Supp. 2d at 1011.

Here, Ms. López Prater alleges that statements from three individuals were defamatory. [Compl. at ¶ 89.] The first statement is from Dr. Everett's November 7, 2022, email in which he said that Ms. López Prater engaged in conduct that was inconsiderate, disrespectful, and Islamophobic. [*Id.*] The second is the statement from the Dean of Students published in the student newspaper that Ms. López Prater's conduct was "an act of intolerance." [*Id.*] Third, she relies upon the statements Mr. Hussein made at the "Community Conversation" that Ms. López Prater showed the images of the Prophet Muhammad for no other reason than to provoke, offend, and hurt Muslim students; that her conduct was "Islamophobic;" and that she showed the paintings because she does not value Muslims the same as other minorities. [*Id.*] She attributes these statements to Hamline because Dr. Everett forwarded a video from the "Community Conversation" event with his email to staff. [Compl. ¶ 60.] Although the Court sympathizes with how difficult it has been for Ms. López Prater to have been the subject of these statements, that does not make them redressable as defamatory.

26

Generally, courts have found terms like "Islamophobic" and "racist," without more, to be nonactionable expressions of opinion or rhetorical hyperbole. *See, e.g.*, *Hindu Am. Found. v. Viswanath*, Civil No. 21-cv-01268 (APM), 2022 WL 17820331, *13 (D.D.C. Dec. 29, 2022) (granting motion to dismiss, in part, because published implications that foundation perpetuated Islamophobia and hate were statements of opinion).   In *Hindu American Foundation*, a non-profit organization brought a defamation claim against critics quoted in online articles who stated that any "American non-profit that perpetuates Islamophobia and other forms of hate should not receive federal funds in any form."  2022 WL 17820331, at *13.  The Court found that this statement was a non-actionable opinion because the critic at issue was expressing her views on what types of organizations were deserving of federal relief funds.  *Id.; see also Cummings v. City of New York*, No. 19-cv-7723 (CM)(OTW), 2020 WL 882335, *20 (S.D.N.Y. Feb. 24, 2020) (dismissing defamation claim as nonactionable opinion where the plaintiff was described in print as "racist").  *Doe #1 v. Syracuse Univ.*, 468 F. Supp. 3d 489, 512 (N.D.N.Y. 2020) is particularly instructive, given that it also took place in the context of higher education, where university officials were quick to give statements on conduct that they perceived to be offensive.  In that case, the university was sent a video that the plaintiffs made as part of a fraternity skit, and the chancellor and other university officials sent various campus-wide messages characterizing the statements and behavior of the students in the video as "extremely racist, anti-semitic, homophobic, sexist, and hostile to people with disabilities." *Id.* at 497.   Collecting cases, the court concluded that terms like "racist" and "anti-Semitic"

have consistently been found to be nonactionable opinions and dismissed plaintiffs'
defamation claims against the officials. *Id.* at 512–15.

Terms like "disrespectful" and "inappropriate" have similarly been found to be
nonactionable expressions of opinion. *See, e.g., Hernandez v. Scottsdale Hotel Grp. LLC*, No.
CV-20-00349-PHX-DWL, 2020 WL 6827745, *3 (D. Ariz. Nov. 20, 2020) (dismissing the
plaintiff's defamation claim, in part, because calling an email "rude, threatening, and
disrespectful" is a statement of opinion that cannot support a claim for defamation and
collecting cases); *Turner v. Wells*, 879 F.3d 1254, 1270 (11th Cir. 2018) (finding statements that
plaintiff "acted inappropriately and demonstrated poor judgment" were pure opinion and not
actionable).

Here, the statements made, adopted, and republished by Hamline are the sort of
non-verifiable statements that courts have held constitute nonactionable opinion. Indeed, the
fact that people (including Muslims) hold different views about whether or not Ms. López
Prater's conduct was Islamophobic or inappropriate further demonstrates the idea that the
statements at issue are opinions that cannot be characterized, let alone proven, as true or false.
The Court grants Hamline's motion and dismisses Ms. López Prater's claim for defamation.[2]

---

[2] Because the Court finds that the statements at issue are nonactionable opinion, the Court
need not reach Hamline's other arguments regarding the viability of Ms. López Prater's
defamation claim.

### D. Intentional Infliction of Emotional Distress ("IIED")

Hamline asserts that Ms. López Prater's claim for IIED should be dismissed because it fails to meet the high threshold required of such claims.  To establish an IIED claim, a plaintiff must allege that the defendant's conduct was: (1) extreme and outrageous, (2) intentional or reckless, and (3) caused emotional distress which, (4) was severe.  *McDonald v. City of St. Paul*, 679 F.3d 698, 708 (8th Cir. 2012) (quoting *Langeslag v. KYMN, Inc.*, 664 N.W.2d 860, 864 (Minn. 2003)).  Successful IIED claims are "sharply limited to cases involving particularly egregious facts," and there is a "high threshold standard of proof."  *Id.* (internal quotation omitted).  "Conduct is extreme and outrageous when it is so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Id.* (quoting *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 439 (Minn. 1983).

Here, Ms. López Prater bases her IIED claim on allegations that Hamline publicly denounced her as an Islamophobic person who engaged in an "act of intolerance," announced her termination before her last day of class, and "assisted and/or facilitated her further public defamation and humiliation."  [Compl. at ¶ 93.]  However, the bar for IIED liability in Minnesota is high, and these allegations do not rise to the level of extreme or outrageous conduct.  While the Court does not doubt the distress Ms. López Prater alleges in her complaint, "[l]iability for intentional infliction of emotional distress does not extend to insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Langeslag*, 664 N.W.2d at 865.  Moreover, the Court has already concluded that the statements at issue here are of the sort that are protected by the First Amendment.  A plaintiff cannot plausibly allege that conduct rises to the level of extreme and outrageous based on statements that do not

29

constitute defamation. *See, e.g.*, *Kiebala v. Boris*, No. 1:16 CV 7478, 2017 WL 4339947, at *6

(N.D. Ill. Sept. 29, 2017), aff'd, 928 F.3d 680 (7th Cir. 2019) (collecting cases concluding that

"a plaintiff cannot prove a claim for intentional infliction of emotional distress based upon a

defendant's defamatory statements, because such statements generally do not clear the high

hurdle for extreme and outrageous conduct").

Ms. López Prater's IIED claim runs headlong into a second problem.  In Minnesota,

the emotional distress resulting from the defendant's conduct must be "so severe that no

reasonable man could be expected to endure it." *Hickman v. Ellison*, No. A23-0127, 2023 WL

4199139, at *3 (Minn. Ct. App. June 26, 2023).  According to Ms. López Prater, she suffered

"immediate, severe, and lasting emotional distress, including various physical manifestations

of that distress." [*Id.* at ¶ 38.]  She also experienced feelings of "isolation, embarrassment, lack

of support, humiliation, and extreme emotional distress." [*Id.* at ¶ 52.]  But a plaintiff needs to

allege more than "general concerns about mental distress or minimal medical treatment" for

the defendant's conduct to rise to actionable IIED. *Ming'ate v. Bank of Am.*, Civil No. 11-1787

ADM/TNL, 2011 WL 4590431, *6 (D. Minn. Sept. 30, 2011) (dismissing IIED claim because

allegations of "humiliation, distress, anxiety and embarrassment" did not rise to the level of

severe emotional distress).   And conclusory statements that a plaintiff has suffered severe

emotional distress are not sufficient to overcome a motion to dismiss. *Cherry v. MCF-Moose

Lake*, No. 22-CV-2012 (JRT/JFD), 2023 WL 1767832, at *6 (D. Minn. Jan. 17, 2023), *report

and recommendation adopted*, No. CV 22-2012 (JRT/JFD), 2023 WL 1767303 (D. Minn. Feb. 3,

2023) (dismissing IIED claim where the plaintiff made a conclusory allegation that the

defendant's conduct caused "extreme emotional distress" but failed to allege how the distress

manifested itself); *Ruolo v. Keystone Shipping Co.*, Civil No. 17-5538 (JRT/LIB), 2018 WL 5619723, *9 (D. Minn. Oct. 30, 2018) (dismissing an IIED claim where the plaintiff pled only general statements that he was distressed, frustrated, and humiliated).  What Ms. López Prater has pleaded is not enough to state a claim for IIED in Minnesota.

Finally, while the Court does not minimize the harm Ms. López Prater alleges she experienced, her claim fails in part because she does not "allege any particularized facts suggesting that [defendant's] conduct caused [her] emotional distress."  *Cherry*, 2023 WL 1767832, at *6.  What Ms. López Prater avers is most distressing about this incident is how, in her own words, it "spread across the globe in the press and on the internet."  [Opp'n Mem. 38, ECF 20.]  That is, the harm that she alleges stems from how the media picked up the story and it snowballed in notoriety, not from the particular words that Hamline officials used or statements that they made in handling the incident.

For these reasons, the Court grants Hamline's motion to dismiss Ms. López Prater's IIED claim.

### E.  Minnesota Whistleblower Act

Finally, Hamline argues that Ms. López Prater's retaliation claim under the Minnesota Whistleblower Act should be dismissed because she did not report a violation of law.  The Minnesota Whistleblower Act prohibits employers from taking adverse action against an employee who "in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law to an employer."  Minn. Stat. § 181.932, subd. 1(1).  The whistleblower does not have to "act with the purpose of exposing an illegality" in order to be considered acting "in good faith."  *Friedlander v. Edwards*

*Lifesciences, LLC*, 900 N.W.2d 162, 166 (Minn. 2017).  Minnesota courts have incorporated the statutory elements of the Minnesota Whistleblower Act into the *McDonnell Douglas* burden-shifting test. *Moore v. City of New Brighton*, 932 N.W.2d 317, 323 (Minn. Ct. App. 2019).  Thus, very similar to her reprisal claim under the MHRA, to establish a prima facie case of retaliation under the Minnesota Whistleblower Act, Ms. López Prater must show that: (1) she engaged in protected conduct; (2) she was subject to an adverse action; and (3) there is a causal connection between the two. *Id.*

While an employee need not identify in her report the specific law being violated to establish a viable Minnesota Whistleblower Act claim, the reported conduct must implicate some federal or state law or rule.  *See Coubal v. Power Sys. AHS, LLC*, Civil No. 20-2296 ADM/JFD, 2022 WL 1541643, *8 (D. Minn. May 16, 2022) (citing *Kratzer v. Welsh Cos., LLC*, 771 N.W.2d 14, 19 (Minn. 2009)).  A report that alleges troubling, but nevertheless lawful behavior, does not constitute protected activity under the Minnesota Whistleblower Act. *Petroskey v. Lommen, Nelson, Cole & Stageberg, P.A.*, 847 F. Supp. 1437, 1447 (D. Minn. 1994) (finding no violation of Minnesota Whistleblower Act where employee's report of law firm partner's sexually abusive tirade of female paralegal, while reprehensible, did not invoke whistleblower protection); *Weber v. Minn. Sch. Bus., Inc.*, No. A14-0831, 2014 WL 7011353, at *3 (Minn. Ct. App. Dec. 15, 2014) (determining employee's report that the employer did not conduct criminal background checks, the employer mishandled its externship program, and the employer failed to inform students about changes in accreditation were not actionable under the Minnesota Whistleblower Act because they did not raise violations of the law).

The unlawful conduct which Ms. López Prater alleges she reported is the defamatory nature of Hamline's statements about her and the incident.[3]  Specifically, Ms. López Prater alleges that she engaged in protected conduct when she emailed Dean Kostihova and Ms. Baker and told them that the "public allegations of Islamophobia" were "defamatory." [Compl. at ¶¶ 43–44.]

The problem for Ms. López Prater, aside from the fact that the Court found these statements not to be defamatory, is that her email report occurred *after* the adverse action of which she complains.  Ms. López Prater objected to Hamline's defamation of her on November 18, 2022, the day that the student newspaper published its initial article.  [Compl. at ¶¶ 42–43.]  However, she had been informed that her contract would not be renewed before sending the email on October 24, 2022, several weeks earlier.  [*Id.* at ¶ 29.]  As alleged, there cannot be a causal connection between the adverse action and the alleged protected activity because the adverse action occurred before the protected activity.  *See, e.g.*, *Chivers v. Wal-Mart Stores, Inc.*, 641 F.3d 927, 933 (8th Cir. 2011) (concluding that adverse actions were not causally connected to protected activity where the adverse employment actions occurred before the plaintiff's reports of discrimination).

In an effort to avoid dismissal, Ms. López Prater points to other actions that came after the report of defamation that she claims are adverse. First, she identifies additional defamatory statements dated after she sent the email.  But she provides no authority supporting the idea

---

[3] This was likely a purposeful choice. Because the MHRA has an exclusive remedy provision, an employee may not seek relief for the same allegedly discriminatory practices under both the MHRA and the Minnesota Whistleblower Act.  *Abraham v. Cnty. of Hennepin*, 639 N.W.2d 342, 347 (Minn. 2002) (citing *Williams v. St. Paul Ramsey Med. Ctr.*, 551 N.W.2d 483, 486 (Minn. 1996)).

that such statements, by themselves, can amount to an adverse employment action, or that they were responsive to the defamation report. She further asserts that Hamline's announcement that she would not be teaching in the spring semester before the fall semester ended was an adverse employment action. But the timing of the announcement is the sort of "[m]inor inconvenience[]" that is "generally insufficient" to comprise an adverse employment action. *Naguib v. Trimark Hotel Corp.*, No. 15-CV-3966 (JNE/SER), 2017 WL 598760, at *6 (D. Minn. Feb. 14, 2017), *aff'd*, 903 F.3d 806 (8th Cir. 2018); *see also Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013) (defining an adverse employment action "as a tangible change in working conditions that produces a material employment disadvantage"). For these reasons, the Court finds that Ms. López Prater has failed to plausibly state a claim for retaliation under the Minnesota Whistleblower Act and dismisses that claim.

**IV.    Order**

For the foregoing reasons, **IT IS HEREBY ORDERED that:**

1.  Plaintiff's Motion to Remand [ECF No. 13] is **DENIED.**

2.  Defendant's Motion to Dismiss [ECF No. 7] is **GRANTED in part and DENIED in part.**  The Court dismisses Ms. López Prater's claims for reprisal, defamation, intentional infliction of emotional distress, and retaliation, but not her claim for religious discrimination.

Date: **September 15, 2023**                    *s/ Katherine M. Menendez*
                                                              Katherine M. Menendez
                                                              United States District Judge